**[J-96-2020]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**


**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**


| | | |
|---|---|---|
| PENNSYLVANIA DEMOCRATIC PARTY, NILOFER NINA AHMAD, DANILO BURGOS, AUSTIN DAVIS, DWIGHT EVANS, ISABELLA FITZGERALD, EDWARD GAINEY, MANUEL M. GUZMAN, JR., JORDAN A. HARRIS, ARTHUR HAYWOOD, MALCOLM KENYATTA, PATTY H. KIM, STEPHEN KINSEY, PETER SCHWEYER, SHARIF STREET, AND ANTHONY H. WILLIAMS | : : : : : : : : : : : : : : : : : | No. 133 MM 2020<br><br><br>SUBMITTED: September 8, 2020 |
| v. | : : : | |
| KATHY BOOCKVAR, IN HER CAPACITY AS SECRETARY OF THE COMMONWEALTH OF PENNSYLVANIA; ADAMS COUNTY BOARD OF ELECTIONS; ALLEGHENY COUNTY BOARD OF ELECTIONS; ARMSTRONG COUNTY BOARD OF ELECTIONS; BEAVER COUNTY BOARD OF ELECTIONS; BEDFORD COUNTY BOARD OF ELECTIONS; BERKS COUNTY BOARD OF ELECTIONS; BLAIR COUNTY BOARD OF ELECTIONS; BRADFORD COUNTY BOARD OF ELECTIONS; BUCKS COUNTY BOARD OF ELECTIONS; BUTLER COUNTY BOARD OF ELECTIONS; CAMBRIA COUNTY BOARD OF ELECTIONS; CAMERON COUNTY BOARD OF ELECTIONS; CARBON COUNTY BOARD OF ELECTIONS; CENTRE COUNTY BOARD OF ELECTIONS; CHESTER COUNTY BOARD OF ELECTIONS; CLARION COUNTY BOARD OF ELECTIONS; CLEARFIELD COUNTY BOARD OF ELECTIONS; CLINTON | : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : | |

COUNTY BOARD OF ELECTIONS;                  :
COLUMBIA COUNTY BOARD OF                     :
ELECTIONS; CRAWFORD COUNTY                   :
BOARD OF ELECTIONS; CUMBERLAND               :
COUNTY BOARD OF ELECTIONS;                   :
DAUPHIN COUNTY BOARD OF                      :
ELECTIONS; DELAWARE COUNTY                    :
BOARD OF ELECTIONS; ELK COUNTY               :
BOARD OF ELECTIONS; ERIE COUNTY              :
BOARD OF ELECTIONS; FAYETTE                  :
COUNTY BOARD OF ELECTIONS;                   :
FOREST COUNTY BOARD OF                       :
ELECTIONS; FRANKLIN COUNTY BOARD             :
OF ELECTIONS; FULTON COUNTY                  :
BOARD OF ELECTIONS; GREENE                   :
COUNTY BOARD OF ELECTIONS;                   :
HUNTINGDON COUNTY BOARD OF                    :
ELECTIONS; INDIANA COUNTY BOARD              :
OF ELECTIONS; JEFFERSON COUNTY               :
BOARD OF ELECTIONS; JUNIATA                  :
COUNTY BOARD OF ELECTIONS;                   :
LACKAWANNA COUNTY BOARD OF                    :
ELECTIONS; LANCASTER COUNTY                   :
BOARD OF ELECTIONS; LAWRENCE                 :
COUNTY BOARD OF ELECTIONS;                   :
LEBANON COUNTY BOARD OF                      :
ELECTIONS; LEHIGH COUNTY BOARD               :
OF ELECTIONS; LUZERNE COUNTY                 :
BOARD OF ELECTIONS; LYCOMING                 :
COUNTY BOARD OF ELECTIONS;                   :
MCKEAN COUNTY BOARD OF                       :
ELECTIONS; MERCER COUNTY BOARD               :
OF ELECTIONS; MIFFLIN COUNTY                 :
BOARD OF ELECTIONS; MONROE                   :
COUNTY BOARD OF ELECTIONS;                   :
MONTGOMERY COUNTY BOARD OF                    :
ELECTIONS; MONTOUR COUNTY BOARD              :
OF ELECTIONS; NORTHAMPTON                    :
COUNTY BOARD OF ELECTIONS;                   :
NORTHUMBERLAND COUNTY BOARD                   :
OF ELECTIONS; PERRY COUNTY BOARD             :
OF ELECTIONS; PHILADELPHIA COUNTY            :
BOARD OF ELECTIONS; PIKE COUNTY              :
BOARD OF ELECTIONS; POTTER                   :
COUNTY BOARD OF ELECTIONS;                   :
SCHUYLKILL COUNTY BOARD OF                    :

ELECTIONS; SNYDER COUNTY BOARD : 
OF ELECTIONS; SOMERSET COUNTY :
BOARD OF ELECTIONS; SULLIVAN :
COUNTY BOARD OF ELECTIONS; :
SUSQUEHANNA COUNTY BOARD OF :
ELECTIONS; TIOGA COUNTY BOARD OF :
ELECTIONS; UNION COUNTY BOARD OF :
ELECTIONS; VENANGO COUNTY BOARD :
OF ELECTIONS; WARREN COUNTY :
BOARD OF ELECTIONS; WASHINGTON :
COUNTY BOARD OF ELECTIONS; :
WAYNE COUNTY BOARD OF :
ELECTIONS; WESTMORELAND COUNTY :
BOARD OF ELECTIONS; WYOMING :
COUNTY BOARD OF ELECTIONS; AND :
YORK COUNTY BOARD OF ELECTIONS :
:
:
PETITION OF: KATHY BOOCKVAR, IN :
HER CAPACITY AS SECRETARY OF THE :
COMMONWEALTH OF PENNSYLVANIA :

**OPINION**

**JUSTICE BAER**                                      **DECIDED: September 17, 2020**

In October 2019, the General Assembly of the Commonwealth of Pennsylvania enacted Act 77 of 2019, which, *inter alia*, created for the first time in Pennsylvania the opportunity for all qualified electors to vote by mail, without requiring the electors to demonstrate their absence from the voting district on Election Day, 25 P.S. §§ 3150.11-3150.17. The Pennsylvania Democratic Party and several Democratic elected officials and congressional candidates, some in their official capacity and/or as private citizens (collectively, "Petitioner"), filed the instant action, initially in the Commonwealth Court, in the form of a petition for review seeking declaratory and injunctive relief relating primarily to five issues of statutory interpretation involving Act 77 and the Election Code, 25 P.S.

§§ 2600-3591.[1] This Court exercised Extraordinary Jurisdiction to address these issues and to clarify the law of this Commonwealth in time for the 2020 General Election.[2]

## I. FACTS AND PROCEDURAL HISTORY

On July 10, 2020, Petitioner filed its petition for review in the Commonwealth Court against Secretary of the Commonwealth Kathy Boockvar ("Secretary") and all 67 county election boards ("Boards").[3] In its petition, Petitioner requested that the Commonwealth Court issue declaratory and injunctive relief "so as to protect the franchise of absentee and mail-in voters." Petition for Review ("Petition"), 7/10/2020, at 5.[4]

---

[1] The caption reflects the Secretary of the Commonwealth Kathy Boockvar as filing the petition before the Court based upon her application for extraordinary review, which this Court granted. Regardless, as noted, we now refer to the plaintiffs in the underlying lawsuit as "Petitioner" and, as noted *infra*, Secretary Boockvar as "Secretary."

[2] Pursuant to 42 Pa.C.S. § 726, this Court

> may, on its own motion or upon petition of any party, in any matter pending before any court or magisterial district judge of the Commonwealth involving an issue of immediate public importance, assume plenary jurisdiction of such matter at any stage thereof and enter a final order or otherwise cause right and justice to be done.

[3] At the time Petitioner filed its petition, an action filed by Donald J. Trump for President, Inc., the Republican National Committee ("RNC"), and several Republican congressional candidates and electors (collectively, "Republican Party") against the Secretary and the Boards was pending in the U.S. District Court for the Western District of Pennsylvania. In that case, the Republican Party alleged federal and state constitutional violations stemming from the recent implementation of no excuse mail-in voting under Act 77. The specific issues raised by the Republican Party in the federal action are, to some extent, the mirror image of the issues raised by Petitioner in the case *sub judice*.

[4] Concurrently, Petitioner filed both an Application for Special Relief in the Nature of an Expedited Motion for Alternative Service and an Application for an Expedited Discovery Schedule and Evidentiary Hearing, to which several responses were filed. On July 15, 2020, the Commonwealth Court denied Petitioner's request for alternative service. On July 30, 2020, the Commonwealth Court, *inter alia*, granted in part and denied in part Petitioner's application for an expedited discovery schedule and evidentiary hearing. In this order, the Commonwealth Court set forth specific deadlines for responsive pleadings.

Specifically, Petitioner raised several discrete issues for the Commonwealth Court's consideration, which are discussed in more detail *infra*. Briefly, in Count 1, Petitioner requested declaratory relief to confirm that Act 77 permits Boards "to provide secure, easily accessible locations as the Board deems appropriate, including, where appropriate, mobile or temporary collection sites, and/or drop-boxes for the collection of mail-in ballots." *Id.* at 47, ¶ 165. Additionally, Petitioner sought an injunction requiring the Boards to "evaluate the particular facts and circumstances in their jurisdictions and develop a reasonable plan … to ensure the expedient return of mail-in ballots." *Id.* at ¶ 166.

In Count 2, Petitioner sought an injunction to "lift the deadline in the Election Code across the state to allow any ballot postmarked by 8:00 p.m. on Election Night to be counted if it is received by the Boards" by 5:00 p.m. on Tuesday, November 10, which is the deadline for ballots to be received under the Federal Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA").[5] *Id.* at 50, ¶ 178. In the alternative, Petitioner posited that the Commonwealth Court could, with a few caveats, "enjoin the Counties to extend a more tailored ballot extension deadline to the date that is 21 days after the particular voter's ballot is mailed by the county[.]" *Id.* at ¶ 179.

In Count 3, Petitioner highlighted that the "procedure for mail-in ballots often leads to minor errors, which result in many ballots being rejected and disenfranchising voters who believe they have exercised their right to vote." *Id.* at 51, ¶ 186. In anticipation of these expected errors, Petitioner again sought an injunction requiring Boards that have knowledge of an incomplete or incorrectly filled out ballot and the elector's contact

---

[5] The UOCAVA delineates, *inter alia*, the process and procedure in which overseas voters and voters in the uniformed services receive absentee ballots for federal elections. *See generally* 52 U.S.C. §§ 20301-20311.

information to contact the elector and provide them "the opportunity to cure the facial defect until the UOCAVA deadline." *Id.* at 52, ¶ 187.

In Count 4, Petitioner requested a declaration that there is no statutory authority to set aside an absentee or mail-in ballot solely for failure to place it into the official election ballot envelope (hereinafter referred to as the "secrecy envelope"), as well as an injunction prohibiting any "naked ballots," which are otherwise without error, from being invalidated.[6] *Id.* at 54, ¶ 198-199. A "naked ballot" refers to an official mail-in ballot that is not placed in the secrecy envelope before mailing.

Finally, in Count 5, Petitioner sought a declaration that the "Election Code's poll watcher residency requirement does not violate the United States Constitution's First and Fourteenth Amendments, its Equal Protection Clause, or the Equal Protection and Free and Equal Elections Clauses of the Pennsylvania Constitution." *Id.* at 55, ¶ 207.

On August 13, 2020, the Secretary filed an Answer and New Matter to the petition. In addition, twenty of the named Boards filed answers with new matter, fourteen of the Boards filed answers, and nine of the Boards filed preliminary objections.[7] Requests to intervene were filed by Donald J. Trump for President, Inc., the Republican Party of Pennsylvania, and the RNC, as well as Joseph B. Scarnati III, President Pro Tempore, and Jake Corman, Majority Leader of the Pennsylvania Senate, in opposition to the petition. The Common Cause Pennsylvania, The League of Women Voters of

---

[6] As explained more fully below, upon receipt of an official mail-in ballot, the mail-in elector is to mark the ballot in secret, and then fold the ballot, enclose, and securely seal the same in the secrecy envelope provided. 25 P.S. § 3150.16(a). The secrecy envelope "shall then be placed in the second one, on which is printed the form of declaration of the elector, and the address of the elector's county board of election and the local election district of the elector." *Id.*

[7] On August 27, 2020, Petitioner filed its: (1) Answer to the Secretary's New Matter; (2) Answer to the new matter filed by various Boards; and (3) an omnibus memorandum of law opposing the preliminary objections filed by several Boards.

Pennsylvania, The Black Political Empowerment Project ("B-PEP"), Make the Road Pennsylvania, a project of Make the Road States ("Make the Road PA"), Patricia M. DeMarco, Danielle Graham Robinson, and Kathleen Wise filed a joint application to intervene as co-petitioners.

On August 16, 2020, the Secretary filed an application asking this Court to exercise extraordinary jurisdiction over Petitioner's petition for review.[8] Highlighting, *inter alia*, the two major political parties' "diametric positions" on the interpretation of several Act 77 provisions and the fast-approaching 2020 General Election, the Secretary asserted that "[t]he exercise of extraordinary jurisdiction by this Court is the only means available to resolve these disputes without disrupting the election." Secretary's Application for Extraordinary Relief, 8/16/2020, at 14-16. On August 19, 2020, Petitioner filed an Answer to the Secretary's application, noting that it had no objection to this Court exercising its extraordinary jurisdiction.[9]

---

[8] In her application, the Secretary informed this Court that she had filed a motion in the aforementioned federal action urging the District Court to abstain from rendering a decision pursuant to *R.R. Comm'n of Tex. v. Pullman*, 312 U.S. 496 (1941) (explaining that, where appropriate, a federal court may abstain from deciding a case to permit a state court the opportunity to resolve a state law question). Secretary's Application for Extraordinary Relief, 8/16/2020, at 17. This motion was later granted. *See Trump for President, Inc.,* 2020 WL 4920952, at *21 (W.D. Pa. 2020).

[9] In addition, on August 18, 2020, Bucks, Chester, Montgomery, and Philadelphia County Boards of Election filed an Answer in Support of the Secretary's application. Likewise, on August 19, 2020, Armstrong, Bedford, Blair, Centre, Columbia, Dauphin, Fayette, Huntingdon, Indiana, Lackawanna, Lawrence, Lebanon, Montour, Northumberland, Venango, and York County Boards of Election also filed an answer joining the Secretary's application. Several of the remaining 67 counties filed no answer letters. On August 20, 2020, answers were filed by the Republican proposed intervenors, as well as proposed co-petitioners, The Common Cause Pennsylvania, The League of Women Voters of Pennsylvania, B-PEP, Make the Road PA, Patricia M. DeMarco, Danielle Graham Robinson, and Kathleen Wise.

Faced with a national election scheduled to occur on November 3, 2020 and substantial legal issues that required the highest court of Pennsylvania's analysis and response to ensure a free and fair election, on September 1, 2020, this Court granted the Secretary's Application and set forth a schedule for supplemental briefing and filings.[10] Later, on September 3, 2020, this Court filed an order granting the motions to intervene filed by the Republican Party of Pennsylvania (hereinafter, "Respondent") and Joseph B. Scarnati III, Pennsylvania Senate President Pro Tempore, and Jake Corman, Senate Majority Leader, representing the Republican Senate Caucus (hereinafter, "Caucus"). Applications to intervene filed by Donald J. Trump for President, Inc., and the RNC; Common Cause of Pennsylvania, the League of Women Voters of Pennsylvania, B-PEP, Make the Road PA, Patricia M. DeMarco, Danielle Graham Robinson, and Kathleen Wise were denied without prejudice to the parties' ability to file briefs as *amicus curiae* pursuant to Pa.R.A.P. 531.[11] The parties have submitted supplemental filings in support of their

---

[10] The Secretary highlighted in her application for extraordinary relief to this Court that there was insufficient time to engage in full pre-trial proceedings and discovery before applications for summary relief could be filed. *See* Secretary's Application for Extraordinary Relief, 8/16/2020, at 13-14. In fact, the Secretary explained that because of all the uncertainties surrounding the case, it was unclear "whether discovery, dispositive motions, and a hearing were even necessary." *Id.* at 14 n.3. She maintained that Petitioner's application to expedite discovery and a hearing in Commonwealth Court was premature. Thus, the Secretary sought extraordinary review of the discrete legal claims alleged in the lawsuit as if at the summary relief stage of the case. Cognizant of our authority when exercising extraordinary jurisdiction, this Court granted the Secretary's request. *See* Order dated 9/1/2020. Accordingly, because of the intense time pressure confronting this Court, we do not address the various procedural filings in the case and, rather, address only the five discrete legal claims before us. *See* 42 Pa.C.S. §726 (this Court may "assume plenary jurisdiction of [any matter pending before any court] at any stage thereof and enter a final order or otherwise cause right and justice to be done").

[11] After this Court granted the Secretary's application and set a schedule for supplemental filings, Bryan Cutler and Kerry Benninghoff, Speaker and Majority Leader of the Pennsylvania House of Representatives, respectively, filed an Application to Intervene, while State Senator Jay Costa, on behalf of the Senate Democratic Caucus filed an

respective positions, and this matter is now ripe for disposition of the discrete five legal issues before us.

## II. RELEVANT OVERARCHING PRINCIPLES OF LAW

Generally speaking, each of the five issues presented by Petitioner presents a pure question of law, over which our standard of review is *de novo* and our scope of review is plenary. *In re Vencil*, 152 A.3d 235, 241 (Pa. 2017). Specifically, in large part, Petitioner requests relief in the form of declarations of law regarding Act 77 pursuant to the Declaratory Judgments Act, 42 Pa.C.S. §§ 7531-7541. Accordingly, we address the issues presented mindful of the following.

The Declaratory Judgments Act, which is to be liberally construed and administered, was promulgated to "settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations[.]" 42 Pa.C.S. § 7541(a). Pertinent to the instant matter, this Act provides, in relevant part, that "[a]ny person . . . whose rights, status, or other legal relations are affected by a statute . . . may have determined any question of construction or validity arising under the . . . statute . . . and obtain a declaration of rights, status, or other legal relations thereunder." 42 Pa.C.S. § 7533.[12]

---

Application to Intervene, which was later amended to include State Representative Frank Dermody, on behalf of the House Democratic Caucus. Because of the necessary expediency of reaching a decision in this case, and given that adequate advocacy has been provided, these applications, submitted close to this Court's deadline for supplemental filings, are denied. In any case, the requests are moot given the issuance of our decision.

[12] Notably, while Petitioner has styled its requested relief as "injunctive" in reality it seeks declaratory relief. We will treat its prayers for relief accordingly. In this regard, as noted, essentially, we are treating the matter as if it is at the summary relief stage. *See Hosp. & Healthsystem Ass'n of Pa. v. Com.*, 77 A.3d 587, 602 (Pa. 2013) ("An application for summary relief may be granted if a party's right to judgment is clear and no material issues of fact are in dispute.") (citation omitted). *See also* Pa.R.A.P. 1532(b) (providing that "[a]t

When presented with matters of statutory construction, this Court is guided by Pennsylvania's Statutory Construction Act, 1 Pa.C.S. § 1501-1991. Under this Act, "the object of all statutory construction is to ascertain and effectuate the General Assembly's intention." *Sternlicht v. Sternlicht,* 876 A.2d 904, 909 (Pa. 2005) (citing 1 Pa.C.S. § 1921(a) ("The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly")). When the words of a statute are clear and unambiguous, "the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S. § 1921(b); *see also Sternlicht*, *supra.* However, when the words of a statute are not explicit, the General Assembly's intent is to be ascertained by consulting a comprehensive list of specific factors set forth in 1 Pa.C.S. § 1921(c). *See also Pennsylvania Associated Builders & Contractors, Inc. v. Commonwealth Dep't of Gen. Servs.,* 932 A.2d 1271, 1278 (Pa. 2007) (recognizing that when the "words of the statute are not explicit, the General Assembly's intent is to be ascertained by considering matters other than statutory language, like the occasion and necessity for the statute; the circumstances of its enactment; the object it seeks to attain; the mischief to be remedied; former laws; consequences of a particular interpretation; contemporaneous legislative history; and legislative and administrative interpretations").

Moreover, we recognize that in this Commonwealth, "[e]lections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." PA. CONST. art. I, § 5 (hereinafter referred to as the "Free and Equal Elections Clause"). The broad text of this specific provision "mandates clearly and unambiguously, and in the broadest possible terms, that *all* elections conducted in this Commonwealth must be 'free and equal.'" *League of Women Voters v. Commonwealth*, 178 A.3d 737, 804 (Pa. 2018) (emphasis in original). Stated another way, this clause was

_____

any time after the filing of a petition for review in an appellate or original jurisdiction matter, the court may on application enter judgment if the right of the applicant thereto is clear.").

"specifically intended to equalize the power of voters in our Commonwealth's election process[.]" *Id.* at 812.

Finally, this Court has previously observed that the purpose and objective of the Election Code, which contains Act 77, is "[t]o obtain freedom of choice, a fair election and an honest election return[.]" *Perles v. Hoffman*, 213 A.2d 781, 783 (Pa. 1965). To that end, the Election Code should be liberally construed so as not to deprive, *inter alia*, electors of their right to elect a candidate of their choice. *Id.* at 784. With these general principles in mind, this Court will address in turn each of the five discrete issues presented by Petitioner.

## III. ISSUES

## A. COUNT I OF THE PETITION FOR REVIEW

Section 3150.16(a) of the Election Code, 25 P.S. § 3150.16(a), is part of Act 77 and pertinent to several issues in this matter. That statutory provision, which is entitled "Voting by mail-in electors," states as follows:

> **(a) General rule.--**At any time after receiving an official mail-in ballot, but on or before eight o'clock P.M. the day of the primary or election, the mail-in elector shall, in secret, proceed to mark the ballot only in black lead pencil, indelible pencil or blue, black or blue-black ink, in fountain pen or ball point pen, and then fold the ballot, enclose and securely seal the same in the envelope on which is printed, stamped or endorsed "Official Election Ballot." This envelope shall then be placed in the second one, on which is printed the form of declaration of the elector, and the address of the elector's county board of election and the local election district of the elector. The elector shall then fill out, date and sign the declaration printed on such envelope. Such envelope shall then be securely sealed and the elector shall send same by mail, postage prepaid, except where franked, or deliver it in person to said county board of election.

25 P.S. § 3150.16(a). The last sentence of this provision is the primary focus of the first question of law that we will address. The plain language of this sentence allows an elector to mail her securely sealed envelope containing the elector's "Official Election Ballot" to

her "county board of election" or, more relevant to this issue, "deliver it in person to said county board of election." *Id.*

In Count I of its petition for review, Petitioner seeks a declaration that a reasonable interpretation of Section 3150.16(a) of the Election Code permits county boards of election to provide electors with as many secure and easily accessible locations to deliver personally their mail-in ballots as each board deems appropriate.[13] Petitioner suggests that these locations can consist of mobile or temporary collection sites and that county boards of election may utilize secure drop-boxes for the collection of hand-delivered mail-in ballots.

Indeed, Petitioner contends that, by enacting Section 3150.16(a) of the Election Code, the General Assembly clearly and unambiguously intended to provide the various county boards of election with the option of accepting hand-delivered mail-in ballots at any location controlled by the boards, not just at the boards' central offices. In support of this position, Petitioner points out, *inter alia*, that pursuant to Section 3151 of the Election Code, the General Assembly empowered each county board of election to receive "ballot

---

[13] Under Count I, Petitioner also sought relief "in the form of an affirmative injunction requiring that county Boards are required to evaluate the particular facts and circumstances in their jurisdictions and develop a reasonable plan reflecting the needs of the citizens of the county to ensure the expedient return of mail-in ballots." Petition at 47, ¶ 166. Petitioner accurately concedes that it must establish a clear right to this relief. *Id.* at ¶ 167; *see Roberts v. Bd. of Directors of Sch. Dist. of City of Scranton*, 341 A.2d 475, 478 (Pa. 1975) (explaining that, "for a mandatory injunction to issue, it is essential that a clear right to relief in the plaintiff be established"). To the extent that Petitioner continues to seek injunctive relief in this form, we summarily decline the request, as there simply is no legal authority that would allow this Court to mandate that the county boards of election "evaluate the particular facts and circumstances in their jurisdictions and develop a reasonable plan reflecting the needs of the citizens of the county to ensure the expedient return of mail-in ballots." In other words, Petitioner cannot establish a clear right to relief with regard to their request for a mandatory injunction.

boxes and returns" in their offices or "in any such other place as has been designated by the board."[14]  25 P.S. § 3151.

The Secretary builds on Petitioner's argument.  In so doing, the Secretary highlights that, in construing Section 3150.16(a) of the Election Code, the Court should consider that the General Assembly defined "county board" or "board" as meaning "the county board of elections of any county herein provided for."  25 P.S. § 2602.  According to the Secretary, this definition clarifies that, for purposes of Section 3150.16(a), "county board of election" refers to a municipal body, not a physical office or address.  In other words, the Secretary believes that, when this definition is used for purposes of Section 3150.16(a), that Section unambiguously permits voters to deliver mail-in ballots in person to places designated by county boards of election, other than their respective office addresses.

In further support of this position, the Secretary asserts that the Election Code contemplates that county boards of election will operate out of multiple locations.  *See* 25 P.S. § 2645(b) (stating, *inter alia*, that the "county commissioners or other appropriating authorities of the county shall provide the county board with suitable and adequate offices at the county seat, property furnished for keeping its records, holding its public sessions and otherwise performing its public duties, and shall also provide, such branch offices for the board in cities other than the county seat, as may be necessary").  Echoing Petitioner's argument, the Secretary further suggests that the Election Code anticipates that "ballot

---

[14] Section 3151 of the Election Code states, in full, as follows:

> Each county board of elections shall cause its office to remain open, in charge of one or more members of the board, during the entire duration of each primary and election, and after the close of the polls, until all the ballot boxes and returns have been received in the office of the county elections board, or received in such other place as has been designated by the board.

25 P.S. § 3151.

boxes and returns" may be received "in the office of the county elections board, or received in such other places as has been designated by the board." 25 P.S. § 3151.

The Secretary insists that the Election Code is devoid of any language limiting county boards of election from accepting delivery of mail-in votes solely at their primary office addresses. In fact, the Secretary takes the position that to hold otherwise would contravene the plain language of the Election Code. However, assuming *arguendo* that this Court deems the Election Code ambiguous on this point, the Secretary advocates that a reasonable interpretation of the Code nonetheless authorizes county boards of election to utilize multiple drop-off sites to accept hand-delivered mail-in ballots.

In this regard, the Secretary focuses on the statutory considerations to which this Court may refer when construing an ambiguous statute, 1 Pa.C.S. § 1921(c), as described *supra*. More specifically, the Secretary posits that the General Assembly enacted Act 77 with the object of increasing the electorate's participation in the electoral process by making it easier and more convenient to vote, providing all electors with the option to mail in their ballots. The Secretary opines that, consistent with this objective, the General Assembly intended to allow county boards of election to accept hand-delivered mail-in ballots at locations besides the boards' central office addresses. The Secretary takes the position that, if this Court deems reasonable the various parties' competing interpretations of the Election Code, then the Court should construe the Code in favor of the right to vote.

Contrary to the contentions of the Secretary and Petitioner, Respondent submits that the Election Code prohibits county boards of election from designating locations other than their established county offices for hand delivery of mail-in ballots. Rather, according to Respondent, Section 3150.16(a) of the Election Code unambiguously mandates that an elector must either mail her mail-in ballot to the office address of the county board of

election or deliver that ballot in person to the same office address. Stated differently, Respondent takes the position that the Election Code requires electors either to place their mail-in ballots, addressed to their county boards of election, into the United States Postal Service's ["USPS"] system or personally to deliver their mail-in ballot to that office.

In further support of this position, Respondent highlights the Election Code's use of the word "office" in the "deadline" provision for mail-in votes, Section 3150.16(c), which states that "a completed mail-in ballot must be received in the office of the county board of elections no later than eight o'clock P.M. on the day of the primary or election." 25 P.S. § 3150.16(c). Respondent also points out that the Election Code requires that a secure envelope containing a mail-in ballot have printed upon it "the address of the elector's county board of election," so that "the elector shall send same by mail, postage prepaid, except where franked, or deliver it in person to said county board of election." 25 P.S. § 3150.16(a). Thus, Respondent believes that, in sum, these statutory directives clearly indicate that the General Assembly intended that electors either mail or personally deliver mail-in ballots to the established office addresses of the county boards of election.

Next, Respondent reminds us that the Secretary and Petitioner are asking this Court to interpret the Election Code to allow voters to deliver their mail-in ballots to locations that will include unmanned drop-boxes. Respondent contends that Petitioner and the Secretary fail to articulate where the Election Code mentions "drop-boxes" or "satellite locations." Respondent then asserts that, if this Court were to interpret the Election Code as Petitioner and the Secretary propose, the Court would invalidate an alleged requirement of Act 77, *i.e.*, the need to deliver mail-in ballots to the established offices of county boards of election.

In addition, Respondent suggests that the preferred interpretation of the Election Code advocated by the Secretary and Petitioner permits the individual counties to

implement differing ballot-return regimes. Respondent avers that this outcome would violate principles of equal protection. In support, Respondent quotes *Pierce v. Allegheny County Bd. of Elections*, 324 F.Supp.2d 684, 697 (W.D. Pa. 2003), for the proposition that "[a] state must impose uniform statewide standards in each county in order to protect the legality of a citizen's vote. Anything less implicates constitutional problems under the equal protection clause of the Fourteenth Amendment." For these reasons, Respondent contends that the interpretation of the Election Code posited by Petitioner and the Secretary must fail.

The primary argument of the Caucus largely tracks that of Respondent, particularly the contention that the relief proposed by Petitioner and the Secretary would create an equal protection problem. According to the Caucus, pursuant to the solution offered by Petitioner and the Secretary, some counties will provide more locations for voters to deliver their mail-in ballots, while other counties will allow voters to convey their mail-in ballots solely to the office addresses of the county boards of election. The Caucus views this possibility as a violation of equal protection.

Notably, in an apparent break from Respondent's position, subject to its equal protection argument, the Caucus seems to concede that Pennsylvania law allows county boards of election to provide for in person delivery of mail-in ballots at more than one county election board office located within the county's borders. However, the Caucus insists that additional offices must comply with various requirements, including those outlined in Section 2645(b) of the Election Code. *See* 25 P.S. § 2645(b) (explaining that "[t]he county commissioners or other appropriating authorities of the county shall provide the county board with suitable and adequate offices at the county seat, property furnished for keeping its records, holding its public sessions and otherwise performing its public duties, and shall also provide, such branch offices for the board in cities other than the

county seat, as may be necessary"). In closing, the Caucus submits that unstaffed drop-boxes would not constitute a branch office of a county board of election and are otherwise not authorized by the Election Code as a method for collecting hand-delivered mail-in ballots.

Turning to our analysis, we observe that the question before us consists of the following two-part query regarding the Election Code: Does the Election Code allow a Pennsylvania voter to deliver her mail-in ballot in person to a location other than the established office address of her county's board of election, and if so, what means can county boards of election utilize to accept hand-delivered mail-in ballots? For the reasons that follow, we find that the parties' competing interpretations of the Election Code on this issue are reasonable, rendering the Code ambiguous as it relates to this query. *See A.S. v. Pennsylvania State Police*, 143 A.3d 896, 905-06 (Pa. 2016) (explaining that a "statute is ambiguous when there are at least two reasonable interpretations of the text").

In reaching this conclusion, we observe that Section 3150.16(a) of the Election Code explicitly allows an elector to deliver in person her securely sealed envelope containing her mail-in ballot "to said county board of election." 25 P.S. § 3150.16(a). The Election Code simply defines "county board" or "board" to mean "the county board of elections of any county herein provided for." 25 P.S. § 2602(c). Thus, the language used by the Legislature regarding where a mail-in ballot may be delivered in person is not solely limited to the official central office of the county board of election, and other sections of the Election Code permit a board of election to operate outside of its principal office. *See, e.g.*, 25 P.S. § 2645(b) (stating, *inter alia*, that the "county commissioners or other appropriating authorities of the county shall provide the county board with suitable and adequate offices at the county seat, property furnished for keeping its records, holding its public sessions and otherwise performing its public duties, and shall also provide, such

branch offices for the board in cities other than the county seat, as may be necessary"). Therefore, on the one hand, these provisions tend to favor the view of Petitioner and the Secretary that the General Assembly did not intend to limit voters to delivering personally their mail-in ballots solely to the established office addresses of their county boards of election. Rather, as these parties rationally contend, when this definition is utilized for purposes of construing Section 3150.16(a), that exercise suggests that a voter can hand deliver her mail-in ballot to any location designated by the county board of election as a place where the board will accept these ballots.

Alternatively, we recognize that Section 3150.16(a) of the Election Code directs that an elector may deliver her mail-in ballot in person only to "the county board of election." 25 P.S. § 3150.16(a). As Respondent in particular understandably emphasizes, neither this statutory language nor any other provision of the Election Code explicitly empowers a county board of election to establish satellite mail-in ballot collection facilities or to utilize secure drop-boxes for purposes of accepting hand-delivered mail-in ballots. These observations, when viewed in the totality of the various arguments, lead us to conclude that the parties' competing interpretations are reasonable.

Accordingly, we turn to interpretive principles that govern ambiguous statutes generally and election matters specifically. In so doing, we are mindful of the "longstanding and overriding policy in this Commonwealth to protect the elective franchise." *Shambach v. Bickhart*, 845 A.2d 793, 798 (Pa. 2004) (citations omitted). Moreover, it is well-settled that, "although election laws must be strictly construed to prevent fraud, they ordinarily will be construed liberally in favor of the right to vote." *Id.* (internal quotation marks omitted). Indeed, "[o]ur goal must be to enfranchise and not to disenfranchise [the electorate]." *In re Luzerne Cty. Return Bd.*, 290 A.2d 108, 109 (Pa. 1972). Lastly, in resolving statutory ambiguity, we may consider, *inter alia*, the occasion

and necessity for, the mischief to be remedied by, and the object to be obtained by the statute. 1 Pa.C.S. § 1921(c)(1), (3), and (4), respectively.

With all of that said, we need not belabor our ultimate conclusion that the Election Code should be interpreted to allow county boards of election to accept hand-delivered mail-in ballots at locations other than their office addresses including drop-boxes. This conclusion is largely the result of the clear legislative intent underlying Act 77, which animates much of this case, to provide electors with options to vote outside of traditional polling places. Section 3150.16(a) of the Election Code undeniably exemplifies this intent by granting the Pennsylvania electorate the right to vote by way of a mail-in ballot beyond the circumstances that ordinarily allow this alternative, such as voter absenteeism.

Accordingly, although both Respondent and the Caucus offer a reasonable interpretation of Section 3150.16(a) as it operates within the Election Code, their interpretation restricts voters' rights, as opposed to the reasonable interpretation tendered by Petitioner and the Secretary. The law, therefore, militates in favor of this Court construing the Election Code in a manner consistent with the view of Petitioner and the Secretary, as this construction of the Code favors the fundamental right to vote and enfranchises, rather than disenfranchises, the electorate.

In light of this conclusion, we will briefly address the equal protection argument of Respondent and the Caucus. The premise of that argument, as detailed *supra*, is that, if this Court interprets the Election Code in a manner that is consistent with the position of Petitioner and the Secretary, which we have, then the county boards of election will employ myriad systems to accept hand-delivered mail-in ballots, which allegedly will be unconstitutionally disparate from one another in so much as some systems will offer more legal protections to voters than others will provide. However, the exact manner in which each county board of election will accept these votes is entirely unknown at this point;

thus, we have no metric by which to measure whether any one system offers more legal protection than another, making an equal protection analysis impossible at this time. Accordingly, the equal protection argument of Respondent and the Caucus does not alter our conclusion in this matter.

Thus, for these reasons, this Court declares that the Election Code permits county boards of election to accept hand-delivered mail-in ballots at locations other than their office addresses including drop-boxes.[15]

## B. COUNT II OF THE PETITION FOR REVIEW

In its second count, Petitioner presents this Court with an as-applied challenge to the Election Code's deadline for receiving ballots ("received-by deadline"), which requires mail-in and absentee ballots to be returned to Boards no later than 8:00 p.m. on Election Day, 25 P.S. §§ 3146.6(c), 3150.16(c). It contends that strict enforcement of this deadline, in light of the current COVID-19 pandemic and alleged delays in mail delivery by the USPS, will result in extensive voter disenfranchisement in violation of the Pennsylvania Constitution's Free and Equal Elections Clause.

As noted above, the Free and Equal Elections Clause provides that "[e]lections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right to suffrage." PA. CONST. art. I, § 5. Petitioner interprets this provision as forbidding the Boards from interfering with the right to vote by failing to act in

---

[15] We note that the Secretary has issued guidelines in this regard specifying that the Boards "may provide voters with access to a secure ballot return receptacle." See Secretary's Post-Submission Communication dated 8/24/2020, setting forth the Secretary's Absentee and Mail-in Ballot Return Guidance at 1.1. Additionally, and consistent with the requirement that all votes must be cast by Election Day, these guidelines specify that: "Authorized personnel should be present at ballot return sites immediately prior to 8:00 p.m. or at the time the polls should otherwise be closed"; "At 8:00 p.m. on election night, or later if the polling place hours have been extended, all ballot sites, and drop-boxes must be closed and locked"; and "Staff must ensure that no ballots are returned to ballot return sites after the close of the polls." Id. at 3.3.

a timely manner so as to allow electors to participate in the election through mail-in voting. Petition at 49, ¶ 176.

In support of its as-applied challenge in regard to the upcoming General Election, Petitioner recounts this Commonwealth's recent experience during the June Primary. It emphasizes that, during the Primary, the Boards were inundated with over 1.8 million requests for mail-in ballots, rather than the expected 80,000 - 100,000, due in large part to the COVID-19 pandemic, which caused many voters to be wary of congregating in polling places. Petitioner's Brief at 2, 51. Petitioner asserts that "[t]his crush of applications created massive disparities in the distribution and return of mail-in ballots." Petition at 24, ¶ 70.

It explains that, while some Boards were able to process the requests within the statutory requirements established by Act 77,[16] other boards, especially those in areas hard-hit by the pandemic, were unable to provide electors with ballots in time for the electors to return their ballot in accord with the statutory deadline. Petition at 23, ¶ 66. Indeed, it avers that in Delaware County, thousands of ballots were "not mailed out until the night" of the Primary, making timely return impossible. Petition at 26, ¶ 77. Bucks County apparently experienced similar delays.

To remedy this situation, the Election Boards of Bucks and Delaware Counties sought relief in their county courts.[17] Recognizing that the Election Code "implicitly

---

[16] Act 77, *inter alia,* requires Boards to verify an applicant's submitted information to determine whether the applicant is "qualified to receive an official mail-in ballot." 25 P.S. § 3150.12b(a). After approving an application, the Election Code, as amended by Act 77, instructs that "the board shall deliver or mail official mail-in ballots to the additional electors within 48 hours." 25 P.S. § 3150.15.

[17] The Election Code grants courts of common pleas the authority to address situations which arise on the day of a primary or general election, 25 P.S. § 3046. Section 3046 entitled "Duties of common pleas court on days of primaries and elections," provides:

granted [the courts the] authority to provide relief when there is a natural disaster or emergency" that threatens to deprive electors of the opportunity to participate in the electoral process, the Courts of Common Pleas of Bucks and Delaware Counties extended the deadline for the return of mail-in ballots for seven days, so long as the ballot was postmarked by the date of the Primary. *In re: Extension of Time for Absentee and Mail-In Ballots to be Received By Mail and Counted in the 2020 Primary Election*, No. 2020-02322-37 (C.P. Bucks) (McMaster, J.)*; see also In re: Extension of Time for Absentee and Mail-In Ballots to be Received By Mail and Counted in the 2020 Primary Election*, No.-CV 2020-003416 (C.P. Delaware)*.*

Petitioner also observes that voters in six counties received an extension to the return deadline pursuant to an executive order issued by Governor Wolf, invoking the Emergency Management Services Code, 35 Pa.C.S. § 7301(c).[18] In Executive Order No. 2020-02, Governor Wolf addressed impediments to timely ballot return arising from the pandemic as well as civil unrest that had arisen immediately before the Primary in the specified counties following the killing of George Floyd by police officers. The impediments included road closures, public transportation disruptions, and curfews. To combat the potential disenfranchisement of voters, especially in light of the "unprecedented number" of mail-in ballots due to the pandemic, the Governor extended

---

During such period said court shall act as a committing magistrate for any violation of the election laws; shall settle summarily controversies that may arise with respect to the conduct of the election; shall issue process, if necessary, to enforce and secure compliance with the election laws; and shall decide such other matters pertaining to the election as may be necessary to carry out the intent of this act.

25 P.S. § 3046.

[18] The affected counties were Allegheny, Dauphin, Delaware, Erie, Montgomery, and Philadelphia.

the received-by deadline for seven days, so long as the ballots were postmarked by the date of the Primary. Governor Wolf, Executive Order No. 2020-02 (June 1, 2020).

While voters in specified counties benefitted from extensions of time to return their ballots, Petitioner emphasizes that the Commonwealth Court rejected a request for a statewide extension of the ballot received-by deadline in *Delisle v. Boockvar*, 319 M.D. 2020 (Pa. Cmwlth. June 2, 2020) (Memorandum Opinion), favoring instead a county-by-county remedy. Indeed, while not mentioned by Petitioner, this Court additionally denied relief to a petitioner seeking a statewide extension of the ballot received-by deadline weeks before the June Primary, where the petitioner similarly argued for the extension based upon the overwhelming number of mail-in ballot applications and delays in the USPS system. *Disability Rights Pa. v. Boockvar*, No. 83 MM 2020, 2020 WL 2820467 (Pa. May 15, 2020).

In light of the lessons learned from the June Primary, Petitioner asserts that a statewide remedy is now necessary for the General Election. It suggests that the lack of a statewide remedy risks an equal protection challenge as only some voters would benefit from the extended deadline based on their county court's determination. Petition at 32-33, ¶ 105. Moreover, it emphasizes that a statewide order from this Court early in the election process would reduce voter confusion, as compared to the last-minute county-by-county relief granted during the Primary to address emergency situations. Petitioner's Brief at 26-27 n.9.

Petitioner avers that the difficulties encountered by Boards processing the ballot applications prior to the June Primary will only be exacerbated in the November General Election. It emphasizes the continued grip of the pandemic, and a potential second wave of infections, which will result in more electors seeking to exercise their right to vote by mail. Petition at 49, ¶ 173-175. Additionally, it recognizes the undisputed fact that heavily

contested Presidential elections involve substantially greater voter participation than largely uncontested primaries, further observing that "[i]t is normal in elections with significant public attention for there to be a flood of registrations received right before deadlines." Petition at 26, ¶ 79. It highlights that the Secretary estimates that 3 million electors will seek mail-in or absentee ballots for the General Election in contrast to the 1.5 million votes cast by mail at the Primary, and the pre-pandemic assumption of 80,000 - 100,000 absentee and mail-in ballots. Petitioner's Brief at 51.

Petitioner asserts that the overwhelming demand on the Boards will be exacerbated by delays in the USPS mail delivery system. Petitioner observes that historically the law presumed that a document placed in a mail collection box would be delivered within three days of placement, rather than the current two to five day delivery expectation of the USPS. *Id.* at 50. Petitioner avers that substantial delivery delays have resulted from a combination of recent operational changes at the USPS and decreased staffing caused by the pandemic. *Id.* at 20-21. It emphasizes that the USPS recently warned that there is a "significant risk" that Pennsylvania voters who submit timely ballot requests will not have sufficient time to complete and return their ballot to meet the Election Code's received-by deadline. *Id.* at 2-3 (quoting USPS General Counsel and Executive Vice President Thomas Marshall's July 29, 2020 letter to the Secretary (hereinafter "USPS General Counsel's Letter"), discussed in detail *infra*).

Petitioner avers that this Court has the authority to act to protect electors' right to cast their ballot, as protected by Pennsylvania's Free and Equal Elections Clause. It emphasizes that "'[c]ourt[s] possess broad authority to craft meaningful remedies' when 'regulations of law . . . impair the right of suffrage.'" *Id.* at 48-49 (quoting *League of Women Voters of Pa.*, 178 A.3d at 809, 822) (alterations in original). It observes that courts have exercised that authority to provide equitable relief to voters faced with natural

disasters that impede their right to vote. As an example, Petitioner highlights the Commonwealth Court's actions in *In re General Election-1985*, 531 A.2d 836, 838-39 (Pa. Cmwlth. 1987), in which the court affirmed a two-week suspension in an election where severe flooding prevented electors from safely voting due to "circumstances beyond their control." Petitioner asserts that Pennsylvania electors in the November General Election similarly face a threat to their ability to vote due to no fault of their own, but instead due to a perfect storm combining the dramatic increase in requested ballots due to the COVID-19 pandemic and the inability of the USPS to meet the delivery standards required by the Election Code.

Accordingly, Petitioner asks this Court to grant an injunction ordering the Respondent to "lift the deadline in the Election Code across the state in a uniform standard to allow any ballot postmarked by 8 p.m. on Election Night to be counted if it is received by the deadline for ballots to be received" under the UOCAVA, specifically by 5:00 p.m. on Tuesday, November 10.[19] Petition at 50, ¶ 178. Recognizing that the Secretary recommends a three-day extension, as detailed below, Petitioner counters that "[a] 7-day extension to the ballot receipt deadline is consistent with the USPS's recommendation to the Secretary that voters should mail their ballots to Boards no later than October 27, 2020," which is seven days prior to Election Day. Petitioner's Brief at 53 (referencing USPS General Counsel's Letter at 2). While it acknowledges that a seven-day extension could impact other post-election deadlines as discussed *infra*, it

---

[19] As adopted in Pennsylvania, the UOCAVA provides that military and overseas ballots will be counted if received by the county board by "5:00 p.m. on the seventh day following the election," which this year will be November 10, 2020. 25 Pa.C.S. § 3511.

As an alternative remedy, Petitioner proposes that each ballot could have an individualized deadline twenty-one days after the specific ballot is mailed by the county, so long as it is received before the UOCAVA deadline. Petition at 50, ¶ 108, 179.

asserts that this Court has the authority to alter those deadlines to be consistent with the relief granted in this case. *Id.* at 55.

As noted, the Secretary sought extraordinary jurisdiction to allow this Court to resolve the various challenges to the mail-in ballot process in an orderly and timely fashion before the impending General Election, where she estimates more than three million Pennsylvanians will exercise their right to vote by mail. Secretary's Brief at 1. The Secretary observes that she previously advocated against a similar request for an extension of the received-by deadline for mail-in and absentee ballots in the *Crossey* case. She, however, reassessed her position following receipt of the USPS General Counsel's Letter, which she attaches to her Application. Secretary's Application at 10, Exhibit A.

Significantly, the USPS General Counsel's Letter opined that "certain deadlines for requesting and casting mail-in ballots are incongruous with the Postal Service's delivery standards," providing for 2-5 day delivery for domestic First Class Mail and 3-10 day delivery for domestic Marketing Mail. USPS General Counsel's Letter at 1. As the parties recognize, the Election Code designates October 27, 2020, as the last day for electors to request a mail-in ballot. 25 P.S. § 3150.12a(a) ("Applications for mail-in ballots shall be processed if received not later than five o'clock P.M. of the first Tuesday prior to the day of any primary or election."). Even if a county board were to process and mail a ballot the next day by First Class Mail on Wednesday, October 28th, according to the delivery standards of the USPS, the voter might not receive the ballot until five days later on Monday, November 2nd, resulting in the impossibility of returning the ballot by mail before Election Day, Tuesday November 3rd. The USPS General Counsel's Letter, instead, advised that voters should mail their ballots no later than October 27, 2020 in order to meet the received-by deadline. USPS General Counsel's Letter at 2. "This mismatch

[between the USPS's delivery standards and the Election Code deadlines] creates a risk that ballots requested near the deadline under state law will not be returned by mail in time to be counted under [Pennsylvania's Election Code]." *Id.* at 1.

In light of the information contained in the USPS General Counsel's Letter, the Secretary concludes that a temporary extension of the Election Code's received-by deadline is necessary for the upcoming General Election to ensure a free and equal election as protected by Article I, Section 5 of the Pennsylvania Constitution. Secretary's Application at 27. The Secretary specifically asks that this Court order an extension of the deadline to allow the counting of any ballot postmarked by Election Day and received on or before the third day after Election Day, which is November 6, 2020.[20] *Id.* at 27-28. The Secretary deems a three-day extension of the deadline, rather than the seven-day extension sought by Petitioner, to be sufficient to address the potential delay in mailing while also not disrupting other elements of election administration. *Id.* at 29.

The Secretary emphasizes that the remedy sought here is not the invalidation of the Election Code's received-by deadline, but rather the grant of equitable relief to extend temporarily the deadline to address "mail-delivery delays during an on-going public health disaster." Secretary's Brief at 18. As no party is seeking the invalidation of the received-by deadline, the Secretary rejects the suggestion of Respondent and the Caucus that the remedy would trigger the nonseverability provision of Act 77, reasoning that the Court would be granting "a temporary short extension to address the exigencies of a natural

---

[20] She specifically recommends that the Court "order that ballots mailed by voters by 8:00 p.m. on Election Day be counted if they are otherwise valid and received by the county boards of election by November 6, 2020. Ballots received within this period that lack a postmark or other proof of mailing, or for which the postmark or other proof of mailing is illegible, should enjoy a presumption that they were mailed by Election Day." Secretary's Application at 29. We observe that this proposal therefore requires that all votes be cast by Election Day but does not disenfranchise a voter based upon the absence or illegibility of a USPS postmark that is beyond the control of the voter once she places her ballot in the USPS delivery system.

disaster" rather than "the invalidation of a statutory deadline." *Id.* at 21 (referencing Section 11 of Act 77 set forth *infra*). She emphasizes that the statutory deadline would remain unchanged for future elections.

The Secretary observes that courts have previously granted temporary equitable relief to address natural disasters, given that neither the Election Code nor the Constitution "provides any procedure to follow when a natural disaster creates an emergency situation that interferes with an election." *Id.* at 19 (citing *In re: General Election-1985*, 531 A.2d at 839).[21] She argues that the current pandemic is equivalent to other natural disasters and that it necessitates the requested extension of the Election Code's received-by deadline for mail-in ballots.

In contrast, Respondent contends that Petitioner asks this Court to rewrite the plain language of Act 77 and to substitute its preferred ballot deadline for the statutory deadline that resulted from the legislative compromise during the bi-partisan enactment of Act 77. It emphasizes that this Court "recently reaffirmed [that] the judiciary 'may not usurp the province of the legislature by rewriting [statutes].'" Respondent's Supplemental Brief at 16 (quoting *In re Fortieth Statewide Investigating Grand Jury*, 197 A.3d 712, 721 (Pa. 2018)).

Judicial restraint, according to Respondent, is especially necessary in regard to election law, where this Court has long recognized that "[t]he power to regulate elections is a legislative one, and has been exercised by the General Assembly since the foundation of the government." *Id.* at 17 (quoting *Winston v. Moore*, 91 A. 520, 522 (Pa. 1914)). Indeed, it observes that the United States Constitution dictates that "[t]he Times,

---

[21] The Secretary observes that other jurisdictions have likewise granted temporary extensions when faced with natural disasters, such as hurricanes. Secretary's Application at 28 (citing *Fla. Democratic Party v. Scott*, 215 F. Supp. 3d 1250, 1259 (N.D. Fla. 2016); *Georgia Coalition for the Peoples' Agenda, Inc. v. Deal*, 214 F. Supp. 3d 1344, 1345 (S.D. Ga. 2016)).

Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each state by the Legislature thereof," subject to directives of Congress, U.S. CONST. art. I, § 4, cl. 1, and that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct," electors for President and Vice President. U.S. CONST. art. II, § 1, cl. 2.[22] Respondent highlights special concerns relevant to Presidential elections, emphasizing that "'[w]ith respect to a Presidential election,' state courts must 'be mindful of the legislature's role under Article II in choosing the manner of appointing electors.'" Respondent's Supplemental Brief at 20 (quoting *Bush v. Gore*, 531 U.S. 98, 114 (2000) (Rehnquist, C.J., concurring)).

Respondent additionally warns that if this Court were to deem application of the deadline unconstitutional and substitute a judicially-determined deadline, it would trigger the nonseverability provision of Act 77, which would invalidate the entirety of the Act, including all provisions creating universal mail-in voting. Specifically, Section 11 provides: "Sections 1, 2, 3, 3.2, 4, 5, 5.1, 6, 7, 8, 9 and 12 of this act are nonseverable. If any provision of this act or its application to any person or circumstances is held invalid, the remaining provisions or applications of this act are void." Act 77, § 11. It emphasizes that this Court has previously deemed nonseverability provisions to be constitutionally proper and additionally recognized that nonseverability provisions are crucial to the legislative process as they "may be essential to securing the support necessary to enact the legislation in the first place." Respondent's Supplemental Brief at 18 (citing *Stilp v. Commonwealth*, 905 A.2d 918, 978 (Pa. 2006)). Respondent asserts that it is clear that the severability provision in Act 77 "was intended to preserve the compromise struck" in the bipartisan enactment. *Id.* at 19.

---

[22] Respondent further observes that the Pennsylvania Constitution specifically directs the Legislature to "provide a manner in which, and the time and place at which" a qualified elector can submit an absentee ballot. PA. CONST. art. VII, § 14(a).

On the merits, Respondent asserts that the plain language of the Election Code setting the deadline for submission of ballots by 8:00 p.m. on Election Day does not violate the Free and Equal Elections Clause but instead provides "a neutral, evenhanded rule that applies to all Pennsylvania voters equally." Respondent's Answer to the Secretary's Application at 21. It emphasizes that numerous courts, including this Court during the June Primary, have upheld the application of mail-in deadlines during the COVID-19 pandemic. Respondent's Supplemental Brief at 24 (citing, *inter alia*, *Disability Rights Pa. v. Boockvar*, No. 83 MM 2020, 2020 WL 2820467 (Pa. May 15, 2020)).

Respondent additionally rejects the Secretary's assertion that the deadline should be extended based upon the threat of mail delays. It avers that these concerns are "speculative at best." *Id.* at 25. Moreover, it contends that "given Pennsylvania's unparalleled and generous absentee and mail-in voting period, any voter's inability to cast a timely ballot is not caused by the Election Day received-by deadline but instead by their own failure to take timely steps to effect completion and return of their ballot." *Id.* at 26-27 (internal citation and quotation marks omitted).

Respondent further supports its argument by attaching to its Supplemental Brief a declaration of USPS Vice President Angela Curtis, which in turn attaches the statement provided by Postmaster General Louis DeJoy to the Senate Committee on Homeland Security and Governmental Affairs on August 21, 2020 and his statement of August 24, 2020, to the House Committee on Oversight and Reform. In his statement, Postmaster General Louis DeJoy addressed public accusations that the implementation of various cost-saving reforms had allegedly resulted in delays in mail delivery that threatened the timely delivery of election mail.

While disputing the validity of the accusations, the Postmaster General provided the following commitments relating to the delivery of election mail:

[R]etail hours at Post Offices won't be changed, and mail processing equipment and blue collection boxes won't be removed during this period. No mail processing facilities will be closed and we have terminated the pilot program that began in July that expedited carrier departures to their delivery routes, without plans to extend or expand it. To clear up any confusion, overtime has, and will continue to be, approved as needed. Finally, effective October 1, 2020, we will engage standby resources in all areas of our operations, including transportation, to satisfy any unforeseen demand for the election.

Statement of Postmaster General Louis DeJoy provided to Senate Committee on Homeland Security and Governmental Affairs Hearing of Aug. 21, 2020, at 14; Statement of Postmaster General Louis DeJoy provided to House Committee on Oversight and Reform of Aug. 24, 2020, at 14. Respondent emphasizes that Postmaster General DeJoy also asserted that the "USPS has not changed [its] delivery standards, [its] processing, [its] rules, or [its] prices for Election Mail[,]" and that it "can, and will, handle the volume of Election Mail [it] receive[s]." Respondent's Supplemental Brief at 10.

Finally, Respondent argues that moving the received-by deadline until after Election Day would undermine the federal designation of a uniform Election Day, as set forth in three federal statues, specifically 3 U.S.C. § 1 ("The electors of President and Vice President shall be appointed, in each State, on the Tuesday next after the first Monday in November, every fourth year succeeding every election of a President and Vice President"); 2 U.S.C. § 7 ("The Tuesday next after the 1st Monday in November, in every even numbered year, is established as the day for the election, in each of the States and Territories of the United States, of Representatives and Delegates to the Congress commencing on the 3d day of January next thereafter."); and 2 U.S.C. § 1 ("At the regular election held in any State next preceding the expiration of the term for which any Senator was elected to represent such State in Congress is regularly by law to be chosen, a United

States Senator from said State shall be elected by the people thereof for a term commencing on the 3d day of January next thereafter.").[23]

The Caucus also files a brief with this Court arguing against the extension of the deadline for mail-in votes. It asserts that "[t]here is no constitutional right to vote by mail" and that states have broad authority to enact regulations to ensure the integrity of its elections, including mail-in ballots, as was done in Act 77, including by setting a deadline for the receipt of ballots. Caucus's Brief at 19.

The Caucus warns that granting an extension of the mail-in ballot received-by deadline in this case "would have a cascading effect on other election code deadlines, thereby causing chaos for election officials and confusion for voters." *Id.* at 26. It observes that the Election Code requires that Boards begin canvassing absentee and mail-in ballots within three days of Election Day and shall continue through the eighth day following the Election. *Id.* at 28 (citing 25 P.S. § 3146.8(g)(2)). Additionally, the Boards shall submit the unofficial returns to the Secretary on the Tuesday following the Election, and the Secretary must determine whether a recount is required within nine days of Election Day, citing 25 P.S. § 3154(f), (g)(2), and the Boards must certify the final results to the Secretary no later than twenty days after Election Day, citing 25 P.S. § 2642(k). It additionally asserts that federal law requires all state recounts and challenges to be "resolved at least 6 days prior to the meeting of electors," which it asserts this year is December 14. Caucus's Brief at 28 n.17 (citing 3 U.S.C. §§ 1, 5). The Caucus therefore urges this Court to refrain from altering the received-by deadline for mail-in ballots, asserting that the "requested injunction would override the election deadlines which were

---

[23] In so arguing, Respondent seemingly ignores the fact that allowing the tabulation of ballots received after Election Day does not undermine the existence of a federal Election Day, where the proposal requires that ballots be cast by Election Day, similar to the procedure under federal and state law allowing for the tabulation of military and overseas ballots received after Election Day.

fully debated and properly enacted by the peoples' representatives in the Pennsylvania General Assembly." *Id.* at 29.

Unlike other provisions of Act 77 currently before this Court, we are not asked to interpret the statutory language establishing the received-by deadline for mail-in ballots. Indeed, there is no ambiguity regarding the deadline set by the General Assembly:

> **Deadline.--**Except as provided under 25 Pa.C.S. § 3511[24] (relating to receipt of voted ballot), a completed mail-in ballot must be received in the office of the county board of elections no later than eight o'clock P.M. on the day of the primary or election.

25 P.S. § 3150.16(c). Moreover, we are not asked to declare the language facially unconstitutional as there is nothing constitutionally infirm about a deadline of 8:00 p.m. on Election Day for the receipt of ballots. The parties, instead, question whether the

---

[24] Section 3511 addresses the timeline for the return of ballots of uniform military and oversees voters and provides for the counting of such votes if delivered to the county board by 5 p.m. on the seventh day after Election Day:

> **§ 3511. Receipt of voted ballot**
>
> **(a) Delivery governs.--**A valid military-overseas ballot cast under section 3509 (relating to timely casting of ballot) shall be counted if it is delivered by 5 p.m. on the seventh day following the election to the address that the appropriate county election board has specified.
>
> **(b) Rule regarding postmarks.--**If, at the time of completing a military-overseas ballot and balloting materials, the voter has declared under penalty of perjury that the ballot was timely submitted, the ballot may not be rejected on the basis that it has a late postmark, an unreadable postmark or no postmark.

25 Pa.C.S. § 3511.

application of the statutory language to the facts of the current unprecedented situation results in an as-applied infringement of electors' right to vote.

In considering this issue, we reiterate that the Free and Equal Elections Clause of the Pennsylvania Constitution requires that "all aspects of the electoral process, to the greatest degree possible, be kept open and unrestricted to the voters of our Commonwealth, and, also, conducted in a manner which guarantees, to the greatest degree possible, a voter's right to equal participation in the electoral process for the selection of his or her representatives in government." *League of Women Voters*, 178 A.3d at 804. Nevertheless, we also recognize that "the state may enact substantial regulation containing reasonable, non-discriminatory restrictions to ensure honest and fair elections that proceed in an orderly and efficient manner." *Banfield v. Cortes*, 110 A.3d 155, 176–77 (Pa. 2015) (internal citation and quotation marks omitted).

As we have recently seen, an orderly and efficient election process can be crucial to the protection of a voter's participation in that process. Indeed, the struggles of our most populous counties to avoid disenfranchising voters while processing the overwhelming number of pandemic-fueled mail-in ballot applications during the 2020 Primary demonstrates that orderly and efficient election processes are essential to safeguarding the right to vote. An elector cannot exercise the franchise while her ballot application is awaiting processing in a county election board nor when her ballot is sitting in a USPS facility after the deadline for ballots to be received.

We are fully cognizant that a balance must be struck between providing voters ample time to request mail-in ballots, while also building enough flexibility into the election timeline to guarantee that ballot has time to travel through the USPS delivery system to ensure that the completed ballot can be counted in the election. Moreover, we recognize that the determination of that balance is fully enshrined within the authority granted to the

Legislature under the United States and Pennsylvania Constitutions. *See* U.S. CONST. art. I, § 4, cl. 1; *id.* art. II, § 1, cl. 2.

Nevertheless, we find the Commonwealth Court's rationale in *In re: General Election-1985* germane to the current challenge to the application of the ballot received-by deadline. In that case, the court recognized that, while neither the Constitution nor the Election Code specified "any procedure to follow when a natural disaster creates an emergency situation that interferes with an election," courts could look to the direction of 25 P.S. § 3046. *In re General Election-1985*, 531 A.2d at 839. As noted, Section 3046 provides courts of common pleas the power, on the day of an election, to decide "matters pertaining to the election as may be necessary to carry out the intent" of the Election Code, which the Commonwealth Court properly deemed to include providing "an equal opportunity for all eligible electors to participate in the election process," which in that case necessitated delaying the election during a flood. *Id.*

We have no hesitation in concluding that the ongoing COVID-19 pandemic equates to a natural disaster. *See Friends of Devito v. Wolf*, 227 A.3d 872, 888 (Pa. 2020) (agreeing "that the COVID-19 pandemic qualifies as a 'natural disaster' under the Emergency Code"). Moreover, the effects of the pandemic threatened the disenfranchisement of thousands of Pennsylvanians during the 2020 Primary, when several of the Commonwealth's county election boards struggled to process the flow of mail-in ballot applications for voters who sought to avoid exposure to the virus. *See, e.g.,* Delaware County Board of Elections' Answer to Petition at 15, ¶ 77 (acknowledging that it "mailed out thousands of ballots in the twenty-four hour period preceding the election"). It is beyond cavil that the numbers of mail-in ballot requests for the Primary will be dwarfed by those applications filed during the upcoming highly-contested Presidential Election in the midst of the pandemic where many voters are still wary of congregating in crowded

locations such as polling places. We acknowledge that the Secretary has estimated that nearly three million Pennsylvanians will apply for mail-in applications, in contrast to the 1.5 million cast during the Primary. Secretary's Brief at 1.

In light of these unprecedented numbers and the near-certain delays that will occur in Boards processing the mail-in applications, we conclude that the timeline built into the Election Code cannot be met by the USPS's current delivery standards, regardless of whether those delivery standards are due to recent changes in the USPS's logistical procedures or whether the standards are consistent with what the General Assembly expected when it enacted Act 77. In this regard, we place stock in the USPS's General Counsel's expression that his client could be unable to meet Pennsylvania's statutory election calendar. General Counsel's Letter at 2. The Legislature enacted an extremely condensed timeline, providing only seven days between the last date to request a mail-in ballot and the last day to return a completed ballot. While it may be feasible under normal conditions, it will unquestionably fail under the strain of COVID-19 and the 2020 Presidential Election, resulting in the disenfranchisement of voters.

Under our Extraordinary Jurisdiction, this Court can and should act to extend the received-by deadline for mail-in ballots to prevent the disenfranchisement of voters. We have previously recognized that, in enforcing the Free and Equal Elections Clause, this "Court possesses broad authority to craft meaningful remedies when required." *League of Women Voters*, 178 A.3d at 822 (citing PA. CONST., art. V, §§ 1, 2, 10; 42 Pa.C.S. § 726 (granting power to "enter a final order or otherwise cause right and justice to be done")). We additionally conclude that voters' rights are better protected by addressing the impending crisis at this point in the election cycle on a statewide basis rather than allowing the chaos to brew, creating voter confusion regarding whether extensions will be granted,

for how long, and in what counties.[25]   Instead, we act now to allow the Secretary, the county election boards, and most importantly, the voters in Pennsylvania to have clarity as to the timeline for the 2020 General Election mail-in ballot process.

After consideration, we adopt the Secretary's informed recommendation of a three-day extension of the absentee and mail-in ballot received-by deadline to allow for the tabulation of ballots mailed by voters via the USPS and postmarked by 8:00 p.m. on Election Day to reduce voter disenfranchisement resulting from the conflict between the Election Code and the current USPS delivery standards, given the expected number of Pennsylvanians opting to use mail-in ballots during the pandemic.[26]   We observe that this extension provides more time for the delivery of ballots while also not requiring alteration of the subsequent canvassing and reporting dates necessary for the Secretary's final reporting of the election results.   In so doing, we emphasize that the Pennsylvania's election laws currently accommodate the receipt of certain ballots after Election Day, as

---

[25] We recognize that we rejected a very similar argument presented in *Disability Rights Pennsylvania* on May 15, 2020, weeks prior to the Primary.   *Disability Rights Pa. v. Boockvar*, No. 83 MM 2020, 2020 WL 2820467 (Pa. May 15, 2020).   At that time, the potential of voter disenfranchisement was speculative as many unknowns existed relating to the magnitude of the pandemic, the extent to which voters would seek mail-in applications, and the ability of Boards to handle the increase.   Those uncertainties no longer exist in light of our experience in the 2020 Primary where thousands of voters would have been disenfranchised but for the emergency actions of the courts of common pleas and the Governor.

[26] We likewise incorporate the Secretary's recommendation addressing ballots received within this period that lack a postmark or other proof of mailing, or for which the postmark or other proof of mailing is illegible.   Accordingly, in such cases, we conclude that a ballot received on or before 5:00 p.m. on November 6, 2020, will be presumed to have been mailed by Election Day unless a preponderance of the evidence demonstrates that it was mailed after Election Day.

We emphasize that voters utilizing the USPS must cast their ballots prior to 8:00 p.m. on Election Day, like all voters, including those utilizing drop boxes, as set forth *supra*.   We refuse, however, to disenfranchise voters for the lack or illegibility of a postmark resulting from the USPS processing system, which is undeniably outside the control of the individual voter.

it allows the tabulation of military and overseas ballots received up to seven days after Election Day. 25 Pa.C.S. § 3511. We conclude that this extension of the received-by deadline protects voters' rights while being least at variance with Pennsylvania's permanent election calendar, which we respect and do not alter lightly, even temporarily.

## C. COUNT III OF THE PETITION FOR REVIEW

In Count III of its petition, Petitioner seeks to require that the Boards contact qualified electors whose mail-in or absentee ballots contain minor facial defects resulting from their failure to comply with the statutory requirements for voting by mail, and provide them with an opportunity to cure those defects. More specifically, Petitioner submits that when the Boards have knowledge of an incomplete or incorrectly completed ballot as well as the elector's contact information, the Boards should be required to notify the elector using the most expeditious means possible and provide the elector a chance to cure the facial defect up until the UOCAVA deadline of November 10, 2020, discussed *supra*.

Petitioner bases this claim on its assertion that the multi-stepped process for voting by mail-in or absentee ballot inevitably leads to what it describes as minor errors, such as not completing the voter declaration or using an incorrect ink color to complete the ballot. *See* 25 P.S. § 3146.6(a) (explaining the process for voting by absentee ballot, which requires, *inter alia*, an elector to mark the ballot using only certain writing implements and ink; and to fill out, date, and sign the declaration printed on the outer envelope); *id.* § 3150.16(a) (explaining the process for voting by mail-in ballot, which imposes the same requirements). According to Petitioner, these minor oversights result in many ballots being rejected and disenfranchising voters who believe they have exercised their right to vote.

Petitioner submits that voters should not be disenfranchised by technical errors or incomplete ballots, and that the "notice and opportunity to cure" procedure ensures that

all electors who desire to cast a ballot have the opportunity to do so, and for their ballot to be counted. Petitioner further claims there is no governmental interest in either: (1) requiring the formalities for the completion of the outside of the mailing envelope to be finalized prior to mailing as opposed to prior to counting, or (2) rejecting the counting of a ballot so long as ballots continue to arrive under federal law, which is the UOCAVA deadline of seven days after Election Day.

As legal support for its position, Petitioner relies upon the Free and Equal Elections Clause. PA. CONST. art. I, § 5 ("Elections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage."); *see also Winston*, 91 A. at 523 (explaining that elections are "free and equal" for constitutional purposes when, *inter alia*, "the regulation of the right to exercise the franchise does not deny the franchise itself, or make it so difficult as to amount to a denial; and when no constitutional right of the qualified elector is subverted or denied him"). It further emphasizes that election laws should be construed liberally in favor of voters, and that "[t]echnicalities should not be used to make the right of the voter insecure." *Appeal of James*, 105 A.2d 64, 65-66 (Pa. 1954). Petitioner also asserts that ballots with minor irregularities should not be rejected, except for compelling reasons and in rare circumstances. *Id.* at 66. Based on these legal principles, as well as this Court's "broad authority to craft meaningful remedies" when necessary, *League of Women Voters*, 178 A.3d at 822, Petitioner claims that the Pennsylvania Constitution and spirit of the Election Code require the Boards to provide a "notice and opportunity to cure" procedure, and that this Court has the authority to afford the relief it seeks.

Unlike the other claims asserted herein, the Secretary opposes Petitioner's request for relief in this regard. She counters that there is no statutory or constitutional basis for requiring the Boards to contact voters when faced with a defective ballot and afford them

an opportunity to cure defects. The Secretary further notes that, while Petitioner relies upon the Free and Equal Elections Clause, that Clause cannot create statutory language that the General Assembly chose not to provide. *See Winston*, 91 A. at 522 (noting that "[t]he power to regulate elections is legislative").

The Secretary submits that so long as a voter follows the requisite voting procedures, he or she "will have an equally effective power to select the representative of his or her choice." *League of Women Voters*, 178 A.3d at 809. Emphasizing that Petitioner presents no explanation as to how the Boards would notify voters or how the voters would correct the errors, the Secretary further claims that, while it may be good policy to implement a procedure that entails notice of defective ballots and an opportunity to cure them, logistical policy decisions like the ones implicated herein are more properly addressed by the Legislature, not the courts.

Respondent echoes the Secretary's opposition to Petitioner's request for relief.[27] Specifically, it reiterates that Petitioner has failed to assert a legal basis to support imposing a "notice and opportunity to cure" procedure, noting that the Free and Equal Elections Clause does not enable courts to rewrite the Election Code to align with a litigant's notion of good election policy. Respondent emphasizes that "ballot and election laws have always been regarded as peculiarly within the province of the legislative branch of government," *Winston*, 91 A. at 522, and that to the extent restrictions are burdensome, relief should be sought in the Legislature. *Id.* at 525.

Respondent also discusses the practical implications of granting Petitioner's request, expressing concern that implementing a "notice and opportunity to cure" procedure would be a monumental undertaking requiring the expenditure of significant resources, particularly on the eve of an election. Respondent thus reiterates that the

---

[27] The Caucus does not advance argument on the merits of this issue.

Legislature, not this Court, is the entity best suited to address the procedure proposed by Petitioner.

Respondent adds that the tardiness of Petitioner's request is alone a sufficient basis to deny it and that, in any event, Petitioner cannot show a "plain, palpable and clear abuse of the [legislative] power which actually infringes on the rights of the electors" with respect to this claim. *Patterson v. Barlow*, 60 Pa. 54, 75 (1869). Respondent notes that, to the contrary, a requirement that voters follow the appropriate procedures when filling out their ballots easily passes constitutional muster.

Upon review, we conclude that the Boards are not required to implement a "notice and opportunity to cure" procedure for mail-in and absentee ballots that voters have filled out incompletely or incorrectly. Put simply, as argued by the parties in opposition to the requested relief, Petitioner has cited no constitutional or statutory basis that would countenance imposing the procedure Petitioner seeks to require (*i.e.*, having the Boards contact those individuals whose ballots the Boards have reviewed and identified as including "minor" or "facial" defects—and for whom the Boards have contact information— and then afford those individuals the opportunity to cure defects until the UOCAVA deadline).

While the Pennsylvania Constitution mandates that elections be "free and equal," it leaves the task of effectuating that mandate to the Legislature. *Winston*, 91 A. at 522. As noted herein, although the Election Code provides the procedures for casting and counting a vote by mail, it does not provide for the "notice and opportunity to cure" procedure sought by Petitioner. To the extent that a voter is at risk for having his or her ballot rejected due to minor errors made in contravention of those requirements, we agree that the decision to provide a "notice and opportunity to cure" procedure to alleviate that risk is one best suited for the Legislature. We express this agreement particularly in light

of the open policy questions attendant to that decision, including what the precise contours of the procedure would be, how the concomitant burdens would be addressed, and how the procedure would impact the confidentiality and counting of ballots, all of which are best left to the legislative branch of Pennsylvania's government. Thus, for the reasons stated, the Petitioner is not entitled to the relief it seeks in Count III of its petition.

## D. COUNT IV OF THE PETITION FOR REVIEW

In Count IV, Petitioner seeks a declaration that under Act 77, the Boards must "clothe and count naked ballots," *i.e.*, place ballots that were returned without the secrecy envelope into a proper envelope and count them, rather than invalidate them. It further seeks a preliminary injunction prohibiting the Boards from excluding such ballots from the canvass.

To understand the nature of a "naked ballot," as well as Petitioner's claim that such ballots are valid and should be counted, we examine the relevant provisions of Act 77. The Act directs Boards to send to the qualified mail-in elector an official mail-in ballot, the list of candidates when authorized, the uniform instructions as prescribed by the Secretary, and two envelopes to be returned to the Boards, as described in detail *infra.* 25 P.S. § 3150.14(c).

Section 3150.14(a) ("Envelopes for official mail-in ballots") explains the nature of the envelopes sent to the mail-in voter. This provision directs the Boards to "provide two additional envelopes for each official mail-in ballot of a size and shape as prescribed by the Secretary of the Commonwealth, in order to permit the placing of one within the other and both within the mailing envelope" addressed to the elector. *Id.* § 3150.14(a). On the smaller of the two envelopes to be returned to the Boards shall be printed only the words "Official Election Ballot." *Id.* On the larger envelope shall be printed: (1) "the form of the declaration of the elector;" (2) the "name and address of the county board of election of

the proper county;" and (3) "information indicating the local election district of the mail-in voter." *Id.*

As noted, Section 3150.16(a) directs the mail-in elector to mark the ballot in secret with the enumerated ink or lead pencil and then fold the ballot, enclose it, and secure it in the smaller envelope on which is printed "Official Election Ballot." 25 P.S. § 3150.16(a). The statute further directs the mail-in elector to place the smaller envelope into the second envelope on which is printed the form of declaration of the elector, the elector's local election district, and the address of the elector's county board of election. *Id.* The statute next directs the mail-in elector to fill out, date, and sign the declaration printed on the second envelope, and secure the ballot and send it by mail or deliver it in person to his or her county board of election. *Id.* A ballot is "naked" for purposes of this action if the mail-in elector fails to utilize the smaller envelope on which is printed "Official Election Ballot," and, instead, places the official election ballot directly into the second envelope, upon which is printed the form of declaration of the elector and the address of the elector's county board of election.

Act 77 additionally sets forth the procedure by which mail-in ballots are canvassed. *See id.* § 3146.8(a) (providing that mail-in ballots "shall be canvassed in accordance with subsection (g)"). Relevant thereto, the Act directs that mail-in ballots cast by electors who died prior to Election Day shall be rejected and not counted. *Id.* § 3146.8(d). Additionally, the Act provides that mail-in ballots shall be counted as long as: (1) election officials verify the ballots by comparing the voter's declaration with the official voting list; and (2) the ballots are not challenged on the ground that the voter is unqualified to vote. *Id.* §§ 3146.8(g)(4); 3150.12b(a)(2). Notably, Section 3146.8(g)(4)(ii) provides that if any of the envelopes on which are printed "Official Election Ballot" "contain any text, mark or symbol which reveals the identity of the elector, the elector's political affiliation or the

elector's candidate preference, the envelopes and the ballots contained therein shall be set aside and declared void." *Id.* § 3146.8(g)(4)(ii).

The crux of Petitioner's position is that although Act 77 directs a mail-in voter to utilize the secrecy envelope in submitting the mail-in ballot, there is no provision in the Election Code authorizing the Boards to discard a ballot on grounds that the voter failed to insert the ballot into the secrecy envelope before returning it to the Boards. Rather, Petitioner asserts, the statute directs the Boards to reject mail-in ballots only if the mail-in elector died prior to Election Day, *id.* § 3146.8(d), the ballot is unverified or challenged on grounds that the mail-in voter was unqualified to vote, *id.* § 3146.8(g)(4), or the ballot is returned in an "Official Election Ballot" envelope that contains "any text, mark or symbol which reveals the identity of the elector, the elector's political affiliation or the elector's candidate preference." *Id.* § 3146.8(g)(4)(ii). Petitioner concludes that the failure to place the ballot in a secrecy envelope does not fall within these enumerated statutory grounds which would result in an invalid mail-in ballot.

Moreover, Petitioner emphasizes that the General Assembly was aware of how to invalidate ballots for lack of a secrecy envelope, as it expressly did so in another provision of the Election Code regarding provisional ballots. *See id.* § 3050(a.4)(5)(ii)(C) (providing that a "provisional ballot shall not be counted if: . . . a provisional ballot envelope does not contain a secrecy envelope").[28] Had the General Assembly intended to invalidate mail-in ballots on this basis, Petitioner submits, the Legislature would have included a similar provision in Act 77, but chose not to do so.

Absent statutory authority directing the Boards to invalidate a ballot based exclusively on the lack of a secrecy envelope, Petitioner contends that the refusal to

---

[28] A provisional ballot is a ballot cast by an individual who claims to be properly registered and eligible to vote at the election district, but whose name does not appear on the district register and whose registration cannot be determined. 25 P.S. § 3050(a.4)(1).

canvass and count ballots cast without a secrecy envelope violates the Election Code, as well as the rights of electors to have their vote counted under the Free and Equal Elections Clause. It posits that rather than disenfranchising the voter in contravention of these edicts, the Boards could take corrective measures to protect privacy, such as placing the naked ballot inside a replacement secrecy envelope before canvassing.

Accordingly, Petitioner requests a declaration that naked ballots must be counted, as well as injunctive relief requiring Boards to undertake reasonable measures to protect the privacy of naked ballots cast by mail-in electors.

The Secretary's position aligns with Petitioner on this issue as she agrees that the counting of naked ballots is permitted by the Election Code and furthers the right to vote under the Free and Equal Elections Clause and the First and Fourteenth Amendments to the United States Constitution.[29]

The Secretary contends that the secrecy envelope procedure set forth in Section 3150.16(a) is merely directory, and that this Court's longstanding precedents establish that ballots should not be disqualified based upon the failure to follow directory provisions. *See Bickhart,* 845 A.3d at 803 (holding that although the Election Code provides that an elector may cast a write-in vote for any person not printed on the ballot, a write-in vote for a candidate whose name, in fact, appears on the ballot is not invalid where there is no

---

[29] The Secretary's position herein is consistent with the directive that the Department of State distributed to the counties on May 28, 2020, indicating that there is no statutory requirement nor any authority for setting aside an absentee or mail-in ballot exclusively because the voter forgot to insert it into the official election ballot envelope. *See* Exhibit B to Petition, Directive of Deputy Secretary for Elections and Commissions Jonathan M. Marks to the county election directors, May 28, 2020. The directive further indicated that "[t]o preserve the secrecy of such ballots, the board of elections in its discretion may develop a process by which the members of the pre-canvass or canvass boards insert these ballots into empty official ballot envelopes or privacy sleeves until such time as they are ready to be tabulated." *Id. See also* Exhibit J to Petition, Guidance for Missing Official Election Ballot Envelopes.

evidence of fraud and the voter's intent is clear); *Wieskerger Appeal*, 290 A.2d 108, 109 (Pa. 1972) (holding that the elector's failure to mark the ballot with the statutorily enumerated ink color does not render the ballot invalid unless there is a clear showing that the ink was used for the purpose of making the ballot identifiable or otherwise indicating fraud).

The Secretary further opines that no fraud arises from counting naked ballots, considering that the naked ballot remains sealed in an envelope and the sealed ballot is certified by the elector. Accordingly, the Secretary concludes that no voter should be disenfranchised for failing to place his or her mail-in ballot in the secrecy envelope before returning it to the Boards.

In response, Respondent argues that the statutory language of Section 3150.16(a), providing that the mail-in elector "shall . . . enclose and securely seal the [ballot] in the envelope on which is printed, stamped or endorsed 'Official Election Ballot,'" is clear and constitutes a mandatory requisite to casting a mail-in ballot, and having that ballot counted. It relies on *In re Canvass of Absentee Ballots of Nov. 4, 2003 Gen. Election*, 843 A.2d 1223 (Pa. 2004) ("*Appeal of Pierce*"), where this Court held that the use of the term "shall" in Section 3146.6(a) of the Election Code, providing that the elector "shall" send an absentee ballot or deliver the ballot in person, carries a mandatory meaning, thereby precluding third parties from hand-delivering absentee ballots to county election boards, and invalidating those ballots that were hand-delivered by a third party. Respondent submits that Section 3150.16(a) requires the same invalidation of ballots where the mandatory statutory requisite of enclosing the ballot in a secrecy envelope is ignored.

Respondent observes that the Election Code further directs election officials to "set aside and declare[] void" a ballot whose secrecy envelope contains "any text, mark, or

symbol which reveals the identity of the elector, the elector's political affiliation or the elector's candidate preference." 25 P.S. § 3146.8(g)(4)(ii). Citing *Appeal of Weiskerger, supra*, it argues that the purpose of this provision is to prevent the disclosure of the elector's identity. Respondent posits that a ballot unclothed by a secrecy envelope and placed directly in the outer envelope also discloses the elector's identity because the outer envelope contains the elector's signed declaration. Thus, it concludes, Section 3146.8(g)(4)(ii) requires invalidation of any ballot contained in an envelope that reveals the identity of the voter, regardless of whether that envelope is a secrecy envelope or an outer envelope. To hold to the contrary, Respondent argues, would violate Article VII, Section 4 of the Pennsylvania Constitution, which provides, in relevant part, that "secrecy in voting shall be preserved." PA. CONST. art. VII, § 4.[30]

Respondent discounts the Secretary's suggestion that because there is no fraud involved in the submission of a naked ballot, the ballot should be counted. The secrecy envelope provision of the statute, in Respondent's view, advances the distinct constitutional interest of protecting the sanctity of the ballot by preventing the ballot from disclosing the elector's identity. The significance of this interest, it submits, distinguishes this matter from cases involving noncompliance with minor procedural demands set forth in the Election Code, such as the color of ink used to mark a ballot or the listing of a write-in candidate whose name already appears on the ballot. Accordingly, Respondent requests that we deny Petitioner's request for declaratory and injunctive relief.

The Caucus reiterates all of the arguments expressed by Respondent. It contends that in addition to violating voter secrecy, the counting of naked ballots raises the concern of voter fraud. It contends that when a ballot arrives at the county election board without

---

[30] Article VII, Section 4 ("Method of elections; secrecy in voting") states, in full, that "[a]ll elections by the citizens shall be by ballot or by such other method as may be prescribed by law: Provided, That secrecy in voting be preserved." PA CONST. art. VII, § 4.

the protective shield of a sealed privacy envelope, the election official cannot guarantee that the ballot travelled from the voter's hand to the county election board without compromise. It argues that there is no way for the election official to verify that the vote was accurately recorded, because the mere act of ascertaining the voter's identity from the elector's declaration may violate the secrecy protections of Article VII, Section 4. The Caucus concludes that the only way to be certain that no fraud has taken place is to reject all naked ballots.

Turning now to our analysis, we observe that, in determining the propriety of naked ballots, we must ascertain the General Assembly's intention by examining the statutory text of the secrecy envelope provision to determine whether it is mandatory or directory, as that will govern the consequences for non-compliance. *See JPay, Inc. v. Dep't of Corr. & Governor's Office of Admin.*, 89 A.3d 756, 763 (Pa. Cmwlth. 2014) (internal citation omitted) (observing that "[w]hile both mandatory and directory provisions of the Legislature are meant to be followed, the difference between a mandatory and directory provision is the consequence for non-compliance: a failure to strictly adhere to the requirements of a directory statute will not nullify the validity of the action involved").

Upon careful examination of the statutory text, we conclude that the Legislature intended for the secrecy envelope provision to be mandatory. We respectfully reject the contentions of Petitioner and the Secretary that because the General Assembly did not delineate a remedy narrowly linked to the mail-in elector's failure to utilize a secrecy envelope, the language of the Election Code is directory, and an elector's violation of the command inconsequential.

As noted, Section 3150.16(a) provides:

[The mail-in elector] shall, in secret, . . . enclose and securely seal the [ballot] in the envelope on which is printed, stamped or endorsed "Official Election Ballot." This envelope shall then be placed in the second one, on which is printed the form of declaration of the elector, and the address of

the elector's county board of election and the local election district of the elector.

*Id.*

This statutory text must be read *in pari materia*[31] with Subsection 3146.8(g)(4)(ii), which also speaks directly to secrecy envelopes, providing:

If any of the envelopes on which are printed, stamped or endorsed the words 'Official Election Ballot' contain any text, mark or symbol which reveals the identity of the elector, the elector's political affiliation or the elector's candidate preference, the envelopes and the ballots contained therein shall be set aside and declared void.

25 P.S. § 3146.8(g)(4)(ii).

These provisions make clear the General Assembly's intention that, during the collection and canvassing processes, when the outer envelope in which the ballot arrived is unsealed and the sealed ballot removed, it should not be readily apparent who the elector is, with what party he or she affiliates, or for whom the elector has voted. The secrecy envelope properly unmarked and sealed ensures that result, unless it is marked with identifying information, in which case that goal is compromised. Whatever the wisdom of the requirement, the command that the mail-in elector utilize the secrecy envelope and leave it unblemished by identifying information is neither ambiguous nor unreasonable.

---

[31] Section 1932 of our Statutory Construction Act, "Statutes in pari materia," provides:

(a) Statutes or parts of statutes are *in pari materia* when they relate to the same persons or things or to the same class of persons or things.

(b) Statutes *in pari materia* shall be construed together, if possible, as one statute.

1 Pa.C.S. § 1932.

As noted cogently by Respondent, this case is distinguishable from those cases relied upon by the Secretary, which deemed mandatory language merely directory and without consequence. For example, in *Bickhart*, 845 A.2d at 795, the Court declined to invalidate a write-in vote cast for a candidate who was named on the ballot proper. In reaching that conclusion, the Court observed that "ballots containing mere minor irregularities should only be stricken for compelling reasons," noting that marking a ballot is an imprecise process, the focus of which is upon the "unmistakable registration of the voter's will in substantial conformity to the statutory requirements." *Bickhart*, 845 A.2d at 798-99 (internal quotation marks and citations omitted).

Similarly, in *Appeal of Weiskerger*, *supra*, this Court declined to invalidate a ballot based upon the "minor irregularity" that it was completed in the wrong color of ink. The statute at issue provided: "Any ballot that is marked in blue, black or blue-black ink . . . shall be valid and counted." 290 A.2d at 109 (citing 25 P.S. § 3063). Thus, the only mandatory direction it provided was for the canvassers who receive the ballots, not the electors who prepared them. In providing that ballots completed in the right color must be counted, the Legislature neither stated nor implied that ballots completed in a different color must not be counted. Neither statutory provision at issue in *Bickhart* nor *Weiskerger* contained anything analogous to the directive at issue in this case, which involves secrecy in voting protected expressly by Article VII, Section 4 of this Court's state charter.

As posited by Respondent, most analogous to the instant case is our decision in *Appeal of Pierce*. There, we held that the Election Code's "in-person" ballot delivery requirement, *see* 25 P.S. § 3146.6, was mandatory, and that votes delivered by third persons must not be counted. The provision in question unambiguously provided that

"the elector shall send [the absentee ballot] by mail, postage [prepaid], except where franked, or deliver it in person to [said county] board of election." *Appeal of Pierce*, 843 A.2d at 1231 (quoting 25 P.S. § 3146.6(a)). The parties seeking to ensure that votes delivered by third parties would be counted cited *Weiskerger* and its flexibility with respect to "minor irregularities."

This Court, however, was unpersuaded and declined the invitation to interpret "shall" as anything less than mandatory. Moreover, the Court rejected precisely the same reasoning for interpreting "shall" as directory that Petitioner and the Secretary offer in this case. As in the instant case, the provision of the Election Code at issue in *Appeal of Pierce* did not expressly provide for voiding a ballot delivered by someone other than the voter. Nevertheless, we held that to construe the in-person requirement "as merely directory would render its limitation meaningless and, ultimately, absurd." *Id.* at 1232. The Court further distinguished *Weiskerger* and its safe harbor for "minor irregularities," noting that the in-person requirement served the salutary purpose of "limit[ing] the number of third persons who unnecessarily come in contact with the ballot[,] . . . provid[ing] some safeguard that the ballot was filled out by the actual voter, . . . and that once the ballot has been marked by the actual voter in secret, no other person has the opportunity to tamper with it." *Id.* The provision thus served the spirit of the Code, "which requires that a voter cast his ballot alone, and that it remain secret and inviolate." *Id.*

Petitioner and the Secretary attempt to distinguish *Appeal of Pierce* by emphasizing that there was no statutory provision in that case that was inconsistent with the judicially inferred remedy, such as the provisional ballot secrecy envelope provision in this case. They assert that here, by contrast, the Legislature has directed the

disqualification of provisional ballots not enclosed in the secrecy envelope, and of mail-in ballots with certain markings on the secrecy envelope, rendering its silence with regard to omitted secrecy envelopes for mail-in ballots all the more conspicuous.

The clear thrust of *Appeal of Pierce*, however, is that, even absent an express sanction, where legislative intent is clear and supported by a weighty interest like fraud prevention, it would be unreasonable to render such a concrete provision ineffective for want of deterrent or enforcement mechanism. What we learn from that decision is that violations of the mandatory statutory provisions that pertain to integral aspects of the election process should not be invalidated *sub silentio* for want of a detailed enumeration of consequences.

We must in all instances assume that the General Assembly does not intend a statute to be interpreted in a way that leads to an absurd or unreasonable result. *See* 1 Pa.C.S. § 1922(1) ("In ascertaining the intention of the General Assembly in the enactment of a statute the following presumptions . . . may be used: (1) That the General Assembly does not intend a result that is absurd, impossible of execution or unreasonable."). The result proffered by Petitioner and the Secretary is no more reasonable than that which the Court in *Appeal of Pierce* found untenable. The Court in *Appeal of Pierce* viewed a textual mandate pertaining to fraud prevention and ballot secrecy as signaling the Legislature's intent that its violation would require voiding the ballot, notwithstanding no statutory provision to that effect. To avoid an absurd result, it inferred that intent from nothing more than the provision itself.

We reach the same result here. It is clear that the Legislature believed that an orderly canvass of mail-in ballots required the completion of two discrete steps before

critical identifying information on the ballot could be revealed. The omission of a secrecy envelope defeats this intention. Moreover, in providing for the disqualification of mail-in ballots that arrive in secrecy envelopes that bear markings identifying the elector, the elector's party affiliation, or the elector's vote, all categories of information that appear on the ballot itself, the Legislature signaled beyond cavil that ballot confidentiality up to a certain point in the process is so essential as to require disqualification. Thus, we find that our holding in *Appeal of Pierce* leads to the inescapable conclusion that a mail-in ballot that is not enclosed in the statutorily-mandated secrecy envelope must be disqualified.

Accordingly, we hold that the secrecy provision language in Section 3150.16(a) is mandatory and the mail-in elector's failure to comply with such requisite by enclosing the ballot in the secrecy envelope renders the ballot invalid.

## E. COUNT V OF THE PETITION FOR REVIEW

In Count V of its petition, Petitioner seeks a declaration specifying that the poll watcher residency requirement, found in Section 2687(b) of the Election Code, 25 P.S. §2687(b), does not violate state or federal constitutional rights.[32] Petition at 55, ¶ 207. The Secretary concurs with Petitioner in this regard.

The Election Code permits candidates and political parties to appoint "poll watchers" to monitor the integrity of the voting process.[33] "Each watcher so appointed

---

[32] Specifically, Petitioner maintains that the poll watcher residency requirement does not violate the United States Constitution's First Amendment, the Fourteenth Amendment, the Equal Protection Clause, or the Equal Protection and Free and Equal Elections Clauses of the Pennsylvania Constitution.

[33] Section 2687(a) provides:

must be a qualified registered elector of the county in which the election district for which

the watcher was appointed is located." 25 P.S. § 2687(b).  This provision, in full, specifies:

> Each watcher so appointed must be a qualified registered elector of the county in which the election district for which the watcher was appointed is located.  Each watcher so appointed shall be authorized to serve in the election district for which the watcher was appointed and, when the watcher is not serving in the election district for which the watcher was appointed, in any other election district in the county in which the watcher is a qualified registered elector: Provided, That only one watcher for each candidate at primaries, or for each party or political body at general, municipal or special elections, shall be present in the polling place at any one time from the time that the election officers meet prior to the opening of the polls under section 1208 until the time that the counting of votes is complete and the district register and voting check list is locked and sealed, and all watchers in the room shall remain outside the enclosed space.  It shall not be a requirement that a watcher be a resident of the election district for which the watcher is appointed.  After the close of the polls and while the ballots are being counted or voting machine canvassed, all the watchers shall be permitted to be in the polling place outside the enclosed space.  Each watcher shall be provided with a certificate from the county board of elections, stating his name and the name of the candidate, party or political body he represents. Watchers shall be required to show their certificates when requested to do so.  Watchers allowed in the polling place under the provisions of this act, shall be permitted to keep a list of voters and shall be entitled to challenge any person making application to vote and to require proof of his qualifications, as provided by this act.  During those intervals when voters are not present in the polling place either voting or waiting to vote, the judge of elections shall permit watchers, upon request, to inspect the voting check list and either of the two numbered lists of voters maintained by the county board: Provided, That the watcher shall not mark upon or alter these official

---

Each candidate for nomination or election at any election shall be entitled to appoint two watchers for each election district in which such candidate is voted for.  Each political party and each political body which had nominated candidates in accordance with the provisions of this act, shall be entitled to appoint three watchers at any general, municipal or special election for each election district in which the candidates of such party or political body are to be voted for.  Such watchers shall serve without expense to the county.

25 P.S. § 2687(a).

election records.  The judge of elections shall supervise or delegate the inspection of any requested documents.

25 P.S. § 2687(b) (footnote omitted).

Petitioner observes that the General Assembly enacted the current poll watcher residency requirement in 2004 and that no changes were made to this requirement in Act 77.  Petitioner asserts that this provision does not suffer from any constitutional infirmities and notes that the provision has been upheld as constitutional by the federal District Court for the Eastern District of Pennsylvania in *Republican Party of Pennsylvania v. Cortés,* 218 F. Supp. 3d 396 (E.D. Pa. 2016), discussed further below.

The Secretary likewise maintains that the poll watcher residency requirement is constitutional.  The Secretary notes that the United States Supreme Court in *Anderson v. Calabrezza*, 460 U.S. 780 (1983), recognized the importance of States in regulating elections.  There, the Court stated,

> We have recognized that, 'as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.'

*Id.* at 788 (citing *Storer v. Brown*, 415 U.S. 724, 730, (1974)).  In this regard, the Secretary observes that the Election Code provides a comprehensive scheme of regulations for voting and elections in the Commonwealth.  The Secretary maintains that these regulatory interests are generally considered sufficient to justify reasonable, nondiscriminatory restrictions on elections.  *Id.*; *see also Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (specifying that "[s]tates may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder").

Regarding the provisions in the Election Code requiring that poll watchers be qualified registered electors from the county in which they serve, like Petitioner, the

Secretary observes that although this Court has not previously addressed the question of whether this requirement is constitutional, the federal District Court for the Eastern District of Pennsylvania has done so and rejected a constitutional challenge to the poll watcher residency requirement in *Cortés*, *supra.*

Specifically, there, the District Court considered a constitutional challenge to Section 2687(b) of the Election Code by the respondent here. Respondent claimed that the poll watcher residency requirement found at Section 2687(b), requiring poll watchers to reside in the county in which they serve, is violative of its Fourteenth Amendment rights to due process and equal protection and their rights to free speech and association under the First Amendment.

The District Court rejected these claims, noting first, that the regulation does not violate due process or equal protection. The court observed that serving as a poll watcher does not implicate a fundamental constitutional right, like the right to vote, but rather, is a right conferred by statute. *Id.* at 408. Additionally, the court found that because the state's regulation of the qualifications of who may serve as a poll watcher does not burden one's voting rights or any other constitutional right, the state imposing the regulation need only cite a rational basis for the regulation to be upheld. *Id.* (citing *Donatelli v. Mitchell*, 2 F.3d 508, 514 & n.10 (3d Circ. 1993) (declining to apply intermediate scrutiny standards because the plaintiffs' fundamental rights were not burdened by state law)); and *Voting for Am., Inc. v. Andrade*, 488 Fed.Appx. 890, 899 (5th Cir. 2012) (applying rational basis review as opposed to an intermediate balancing test because state election law did not implicate or burden specific constitutional rights). In this regard, the court concluded as follows:

> There is a rational basis for Section 2678(b)'s requirement that poll watchers be qualified electors in the county in which they work. The Secretary notes that in 1937, the General Assembly enacted a county-based scheme to manage elections within the state, and consistent with that

scheme the legislature endeavored to allow county election officials to oversee a manageable portion of the state in all aspects of the process, including in credentialing poll watchers. In short, Pennsylvania opted to design a county-by-county system of elections; in doing so it ensured as much coherency in this patchwork system as possible. To that end it ensured that participants in the election--voters and watchers alike--were qualified electors in the relevant county. The legislature's decision to allow county election officials to credential only poll watchers from their own county is rationally related to the state's interest in maintaining its county-run election system; each county election official is tasked with managing credentials for a discrete part of the state's population. As the Secretary's counsel noted at the hearing, the legislature chose to 'draw the lines' at the county level, something entirely rational in fashioning a scheme for a state as large as Pennsylvania.

*Cortés*, 218 F.Supp. 3d at 409.

The District Court, likewise, rejected Respondent's claims that Section 2687 violates the First Amendment. The court first noted that courts have found that "poll watching is not incidental to" the right of free association and has "no distinct First Amendment protection." *Id.* at 414 (citing *Cotz v. Mastroeni,* 476 F.Supp.2d 332, 364 (S.D. N.Y. 2007); and *Dailey v. Hands*, No. 14-00423, 2015 WL 1293188, at *5 (S.D. Ala. Mar. 23, 2015) ("[P]oll watching is not a fundamental right protected by the First Amendment.")). Moreover, the court found that poll watchers do not engage in core political speech while completing their duties. *Id.* at 415. Rather, the court observed that "when a poll watcher reports incidents of violations, he is performing a public function delegated by the state." *Id.* (citing *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 158 (1978) (stating that "[w]hile the Constitution protects private rights of association and advocacy with regard to the election of public officials, [the Supreme Court] cases make it clear that the conduct of the elections themselves is an [e]xclusively public function.")). Thus, the District Court found that the Commonwealth's county poll watcher residency requirement did not implicate poll watchers' private rights of association or advocacy and, therefore, did not violate the First Amendment.

Respondent again maintains that the poll watcher residency requirement set forth in the Election Code is unconstitutional.[34] First, Respondent maintains that *Cortés* is distinguishable from this matter because of the procedural posture and the timing of that case. Specifically, Respondent emphasizes the fact that in *Cortés* it sought a preliminary injunction eighteen days before the general election and that on this basis the court found the request for relief to be untimely. Thus, it contends that the court's further discussion of the constitutionality of the poll watcher residency requirement was *dicta*.

Additionally, Respondent argues that the court in *Cortés*, like the Secretary here, gave short shrift to the Commonwealth's obligation to safeguard the electorate from voter fraud, noting that "every voter in a federal . . . election, whether he votes for a candidate with little chance of winning or for one with little chance of losing, has a right under the Constitution to have his vote fairly counted, without its being distorted by fraudulently cast votes." Respondent's Brief at 45 (citing *Anderson v. United States*, 417 U.S. 211, 227 (1974)). Respondent maintains that due to the distribution of voters throughout the Commonwealth, the county residency requirement makes it difficult for both political parties to identify poll watchers in all precincts. Thus, it asserts that, in the absence of poll watchers, "fraud can flourish." *Id.* at 46. Respondent further argues that with Pennsylvania moving to an entirely new election regime under Act 77, with alleged increased opportunities for ballot fraud and tampering, the need for poll watchers is heightened.

Turning to the merits, initially, regarding Respondent's assertion that the District Court's discussion of the constitutionality of the poll watcher residency requirement constitutes *dicta* because the court found the claims there to be untimely, we note that

---

[34] The Caucus does not advocate in favor of finding the poll watcher residency requirement unconstitutional.

although that court pointed out that the emergent nature of Respondent's claims amounted to a "judicial fire drill" based on their late filing, the court opined further that the relief sought "would be inappropriate for a number of reasons, not the least of which is that at this late hour courts should not disrupt an impending election 'absent a powerful reason for doing so.'" *Cortés,* 218 F.Supp.3d. at 405 (citation omitted). The court then went on to analyze the merits of the constitutional claims asserted and denied relief. Accordingly, it appears the court made its decision on multiple bases, including the merits as well as the timing of the claims. Moreover, regardless of the status of the District Court's determination of the constitutional issues presented there, we find its analysis persuasive and agree with its reasoning in upholding the constitutionality of the poll watcher residency requirement.

The "times, places and manner" of conducting elections generally falls to the states. U.S. CONST. art. I, § 4 (providing that "the Times, Places and Manner of holding Elections…shall be prescribed in each State by the Legislature thereof"). Pennsylvania has enacted a comprehensive code of election laws pursuant to its authority to regulate its elections. The General Assembly, in enacting its comprehensive scheme, has required that any person serving as a poll watcher for a particular candidate or party be a resident of the county in which she serves in her position. 25 P.S. § 2687(b).

This provision is a legislative enactment which enjoys the presumption that the General Assembly did not intend to violate constitutional norms, "in part because there exists a judicial presumption that our sister branches take seriously their constitutional oaths." *Stilp v. Commonwealth,* 905 A.2d 918, 938–39 (Pa. 2006); *see also* 1 Pa.C.S. §1922(3). Accordingly, a statute is presumed to be valid, and will be declared unconstitutional only if it is shown to be "clearly, palpably, and plainly [violative of] the

Constitution." *West Mifflin Area School District v. Zahorchak*, 4 A.3d 1042, 1048 (Pa. 2010).

In analyzing whether a state election law violates the constitution, courts must first examine the extent to which a challenged regulation burdens one's constitutional rights. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). Upon determining the extent to which rights are burdened, courts can then apply the appropriate level of scrutiny needed to examine the propriety of the regulation. *See id.* (indicating that "the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights").

Where a state election regulation imposes a "severe" burden on a plaintiff's right to vote, strict scrutiny applies and requires that the regulation is "narrowly drawn to advance a state interest of compelling importance." *Id.* When a state election law imposes only "reasonable, nondiscriminatory restrictions," upon the constitutional rights of voters, an intermediate level of scrutiny applies, and "the State's important regulatory interests are generally sufficient to justify" the restrictions. *See Id.* (upholding Hawaii's ban on write-in voting in the primary where doing so places a minimal burden on one's voting right and supports the state's interest in supporting its ballot access scheme). Where, however, the law does not regulate a suspect classification (race, alienage, or national origin) or burden a fundamental constitutional right, such as the right to vote, the state need only provide a rational basis for its imposition. *See Donatelli*, 2 F.3d at 510 & 515.

In examining the constitutionality of the poll watcher residency provision at issue here, we conclude, as the District Court in *Cortés* concluded, that it imposes no burden on one's constitutional right to vote and, accordingly, requires only a showing that a rational basis exists to be upheld. In this regard, as the District Court aptly noted, there

is no individual constitutional right to serve as a poll watcher; rather, the right to do so is conferred by statute. *Cortés*, 218 F.Supp.3d at 408. Additionally, courts have indicated that "poll watching is not incidental to" the right of free association and, thus, "has no distinct First Amendment protection." *Cotz*, 476 F.Supp.2d at 364. Finally, poll watching does not implicate core political speech. *Cortés*, 218 F.Supp.3d at 415.

As the poll watcher county residency requirement does not burden one's constitutional voting rights, the regulation need only be shown to satisfy a rational basis for its imposition. Again, as the District Court aptly recounted, from its inception, Pennsylvania has envisioned a county-based scheme for managing elections within the Commonwealth. Consistent therewith, the Legislature has endeavored to allow county election officials to oversee and manage their portion of the state in all aspects of the election process, including credentialing poll watchers. Given that Pennsylvania's General Assembly chose a county-based scheme for conducting elections, it is reasonable that the Legislature would require poll watchers, who serve within the various counties of the state, to be residents of the counties in which they serve. Thus, there is a clear rational basis for the county poll watcher residency requirement, and we determine, therefore, that this requirement should be upheld.

Respondent does not claim that poll watching involves a fundamental constitutional right or that a level of scrutiny other than rational basis needs to be shown regarding the regulation of poll watcher qualifications. Instead, Respondent claims that poll watchers are vital to protect against voter fraud and that because of the distribution of voters throughout Pennsylvania, the residency requirement makes it difficult to identify poll watchers in all precincts. While Respondent asserts the greater need for poll watchers because of heightened election fraud involving mail-in voting, these claims are

unsubstantiated and are specifically belied by the Act 35 report issued by the Secretary on August 1, 2020, concerning mail in voting in the Primary Election, finding:

> [D]ata provided by the counties reinforces numerous independent studies that conclude that mail ballot fraud is exceedingly rare, and it demonstrates that the errors that occurred [in the Primary Election] accounted for a very small fraction of the nearly 1.5 million absentee and mail-in ballots requested and cast by voters.

Pennsylvania 2020 Primary Election Act 35 of 2020 Report at 39; Appendix to Petitioner's Brief, Exhibit F. Moreover, Respondent's speculative claim that it is "difficult" for both parties to fill poll watcher positions in every precinct, even if true, is insufficient to transform the Commonwealth's uniform and reasonable regulation requiring that poll watchers be residents of the counties they serve into a non-rational policy choice.

Based on the foregoing, we conclude that the poll watcher residency requirement does not violate the state or federal constitutions.[35] Accordingly, we grant the relief sought by Petitioner in their petition for review and declare the poll watcher residency requirement set forth in Section 2687(b) of the Election Code, 25 P.S. § 2687(b), to be constitutional.

## IV. CONCLUSION

Based on our disposition of all of the claims set forth above, we grant relief on the claims set forth in Counts I, II, and V of the Democratic Party's petition for review as follows and hold that: (Count I) the Election Code permits county boards of election to collect hand-delivered mail-in ballots at locations other than their office addresses including drop-boxes as indicated herein, *see supra.* at 20 n. 15; (Count II) a three-day extension of the absentee and mail-in ballot received-by deadline is adopted such that

---

[35] Respondent has not asserted that the Pennsylvania Constitution offers greater protection under the circumstances presented. Thus, for purposes of our review, we treat them as co-extensive.

ballots mailed by voters via the United States Postal Service and postmarked by 8:00 p.m. on Election Day , November 3, 2020, shall be counted if they are otherwise valid and received by the county boards of election on or before 5:00 p.m. on November 6, 2020; ballots received within this period that lack a postmark or other proof of mailing, or for which the postmark or other proof of mailing is illegible, will be presumed to have been mailed by Election Day unless a preponderance of the evidence demonstrates that it was mailed after Election Day; (Count V) the poll watcher residency requirement set forth in Section 2687(b) of the Election Code, 25 P.S. § 2687(b), is constitutional.  Also, for the reasons set forth herein, we deny the relief sought in Count III and IV of the petition for review.

Justices Todd, Dougherty, and Wecht join the opinion.

Chief Justice Saylor and Justice Mundy join Parts I, II, and III(C), (D) and (E) of the opinion.

Justice Donohue joins Parts I, II, and III(A), III(C), III(D) and III(E) of the opinion.

Justice Wecht files a concurring opinion.

Chief Justice Saylor files a concurring and dissenting opinion in which Justice Mundy joins.

Justice Donohue files a concurring and dissenting opinion in which Chief Justice Saylor and Justice Mundy join Part II.